IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 00-50757
Summary Calendar
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MICHAEL BRETT JACQUINOT,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Western District of Texas
_____

July 17, 2001

Before EMILIO M. GARZA, STEWART and PARKER, Circuit Judges.

PER CURIAM:

Michael Brett Jacquinot appeals his conditional guilty plea conviction and sentence for possession with intent to distribute marijuana. He argues that the district court erred by: (1) denying his motion to suppress the evidence obtained from a roving border patrol stop of the truck in which he was a passenger and (2) applying U.S.S.G. § 2D1.1(b)(1) to increase his base offense level for possession of a firearm. We affirm.

**I. FACTS**

Michael Brett Jacquinot was indicted for possession with the intent to distribute between 100 and 1,000 kilograms of marijuana, in violation of 21 U.S.C. § 841(a)(1). Jacquinot

1

moved to suppress the evidence obtained as the result of the stop of a vehicle in which he was riding, asserting that the border patrol agents did not have reasonable suspicion to stop the vehicle.

An evidentiary hearing was held on Jacquinot's motion. Border Patrol Agent Andrew P. Graham, a three-year veteran of the Border Patrol, testified that he and eleven-year veteran Border Patrol Agent Jay Snodgrass were stationed in Alpine, Texas, and were assigned to patrol a 140-mile area of the United States/Mexican border, including the Big Bend National Park. While Graham's patrol experience was all in the Alpine, Texas, area, Snodgrass had transferred to Alpine a few months earlier, having previously served at the Marfa Sector Area Operations Center and the Laredo, Texas, border area. During his tenure with the Border Patrol, Graham had been involved with at least 30 narcotics cases and 15 to 20 alien smuggling cases.

Texas Highway 385 is notorious for smuggling, and in the prior six months, Agent Graham had noticed an increase in alien and smuggling apprehensions on that highway. Agent Graham attributed this increase in activity on Highway 385 to the Border Patrol's enhanced enforcement on other nearby highways.

In the early morning hours of Sunday, January 16, 2000, Agents Graham and Snodgrass were parked on Highway 385, approximately 75 miles north of the United States/Mexican border. At 5:45 a.m., the agents were notified by Marfa Sector Communications that vehicle sensors located inside Big Bend

National Park and well within 50 miles of the United States/Mexican border had indicated two northbound vehicles traveling from within the park.  The area in which the sensors are located is very remote and is intersected only by ranch roads.  The fact that two vehicles activated the sensors at approximately the same time made Graham suspicious that one may be a lead car and the other a load car carrying contraband. Subsequent vehicle sensors were triggered, indicating to Agent Graham that the two vehicles that had triggered the first sensor were continuing toward their location.

At approximately 6:45 a.m., Agent Graham observed two vehicles pass by his location.  Agent Graham believed that these were the vehicles that had activated the first sensor within the park, and he and Agent Snodgrass began to follow them in separate marked Border Patrol vehicles.  The first vehicle that had passed the agents' location was a late model four-door sedan carrying an older Anglo couple and bearing a park registration receipt taped to the windshield and a Mississippi license plate.  The vehicle appeared typical of the tourist traffic coming out of the park. Agent Graham got directly behind the vehicle to check its registration, and the vehicle continued to drive normally.  Agent Graham concluded that the first vehicle was probably not involved in any illegal activity.

The second vehicle was a large white Ford pickup truck with a lot of equipment in its bed; it appeared to be a work truck and did not have a park sticker on its windshield.  Agent Graham was

3

able to see only that the driver was a small-framed person wearing a baseball cap. Agent Graham was surprised to see a work truck coming out of the park on a Sunday morning before six o'clock. He normally saw construction vehicles leaving the park in groups at the end of the work day or on Friday evenings at the end of the work week. The truck bore a Kansas license plate, which made Agent Graham suspicious because the park typically hires contractors from the local area. Additionally, Agent Graham was aware of a recent narcotics smuggling operation in the Alpine area destined for locations in Kansas.

Agent Graham got to within two car lengths of the truck to read the registration and then followed the truck from ten car lengths. Agents Graham and Snodgrass continued to follow the truck while they awaited registration information on it. The truck slowed to fifteen miles per hour below the average speed limit. Typically, Agent Graham does not see vehicles dramatically change their speed unless the vehicle was not traveling the speed limit before being followed by an agent.

The agents were unable to obtain the registration information because of computer-system problems, but they continued to follow the truck. As the truck approached Marathon, Texas, it stopped at a stop sign, activated its left turn signal, and then remained stopped for five seconds before turning left onto Highway 90. Agent Graham found the truck's pause at the stop sign to be much longer than what he normally sees. Agent Graham also found the truck's left turn to be strange because

4

most vehicles coming up Highway 385 would continue straight on that road toward Fort Stockton and Interstate 10. By turning left, the truck began traveling toward Alpine; however, the most direct and logical route of travel from Big Bend to Alpine is Highway 118. In Agent Graham's experience, most visitors to such a remote area with limited gas stations have a map and know which roads to take.

The truck then drove through Marathon at 20 miles per hour. There was a school zone sign limiting speeds to 20 miles per hour when the sign was flashing, but the sign was not flashing, it was a Sunday morning, and there were no pedestrians, children, or other vehicles on the street. Agent Graham felt that the truck was trying to avoid being pulled over. Agent Graham confirmed Agent Snodgrass' prior observation that the truck was carrying tool boxes, a spare gas tank, and an air tank. After following the truck for a total of approximately fifteen minutes, Graham determined that it was more likely than not that the truck was involved in illegal activity. His determination was based on: the unusual hour that this apparently non-tourist work vehicle left the park; the truck's Kansas license plate, since he had personal experience with a smuggling organization transporting marijuana from the Big Bend area to Kansas; the absence of a park registration sticker on the vehicle, indicating that it had not been in the park for any length of time; the fact that the truck appeared to have transited the park from the west side to the east side, which was a tactic smugglers had recently been using

5

to circumvent Border Patrol traffic or checkpoint operations; Highway 385's reputation for the smuggling of aliens and narcotics; and the driver's behavior when they were following the truck. Agent Graham stopped the truck 70 or 80 miles from the United States/Mexico border.

The district court denied Jacquinot's motion, determining that the agents' stop of the truck was justified by reasonable suspicion and did not violate the Fourth Amendment. Jacquinot entered a conditional plea of guilty, reserving his right to appeal the denial of his suppression motion. The presentence report ("PSR") applied a two-level adjustment to Jacquinot's base offense level for the possession of a dangerous weapon, as two unloaded handguns had been found in the truck. See U.S.S.G. § 2D1.1(b)(1). Jacquinot filed an objection to the adjustment, arguing that it was clearly improbable that the weapons had been connected to the drug offense. The district court overruled Jacquinot's objection to the two-level adjustment.

The district court sentenced Jacquinot to 46 months' imprisonment, three years' supervised release, a $2,500 fine, and a $100 special assessment. Jacquinot filed a timely notice of appeal.

## II. ANALYSIS

### a. Roving Border Patrol Stop

Jacquinot asserts that the district court erred in denying his motion to suppress the evidence obtained from the stop of the truck. He contends that the circumstances known to the border

6

patrol agents did not give rise to a reasonable suspicion that the truck was involved in illegal activities.

In reviewing the denial of a motion to suppress, the district court's factual findings are reviewed for clear error, and its legal conclusions, including whether there was reasonable suspicion for a stop, are reviewed de novo. United States v. Inocencio, 40 F.3d 716, 721 (5th Cir. 1994). A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole. United States v. Shipley, 963 F.2d 56, 58 (5th Cir. 1992). Further, "[t]he evidence presented at a pre-trial hearing on a motion to suppress is viewed in the light most favorable to the prevailing party." Inocencio, 40 F.3d at 721.

A border patrol agent conducting a roving patrol may make a temporary investigative stop of a vehicle only if the agent is aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicle's occupant is engaged in criminal activity. See United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975); United States v. Cortez, 449 U.S. 411, 417-18 (1981). Factors that may be considered in an analysis of reasonable suspicion include: (1) proximity to the border; (2) characteristics of the area; (3) usual traffic patterns; (4) agent's previous experience in detecting illegal activity; (5) behavior of the driver; (6) particular aspects or characteristics of the vehicle; (7) information about recent illegal trafficking in aliens or narcotics in the area; and (8) the number, appearance, and

7

behavior of the passengers.  Brignoni-Ponce, 422 U.S. at 884-85; see also Inocencio, 40 F.3d at 722.  The reasonable suspicion analysis is a fact-intensive test in which the court looks at all circumstances together to weigh not the individual layers, but the laminated total.  United States v. Zapata-Ibarra, 212 F.3d 877, 881 (5th Cir.), cert. denied, 121 S. Ct. 412 (2000). Factors that ordinarily constitute innocent behavior may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers.  Id.

In the instant case, the district court found that the totality of the circumstances provided the agents with reasonable suspicion to warrant the stop of the truck in which Jacquinot was driving.  The court identified the following Brignoni-Ponce factors as supporting the validity of the stop.

Proximity to the border

One of the vital elements in the reasonable suspicion test is whether the agents had reason to believe that the vehicle in question recently crossed the border.  United States v. Melendez-Gonzalez, 727 F.2d 407, 411 (5th Cir. 1984).  Although this court does not adhere to a bright line test with regard to this factor, a car traveling more than 50 miles from the border is usually viewed as being too far from the border to support an inference that it originated its journey there.  Zapata-Ibarra, 212 F.3d at 881.  The proximity element is satisfied, though, if the defendant's car was first observed within 50 miles of the United States/Mexico border, but was stopped more than 50 miles from the

8

border.  See United States v. Villalobos, 161 F.3d 285, 289 (5th Cir. 1998).  If there is no reason to believe that the vehicle came from the border, the remaining factors must be examined charily.  United States v. Rodriquez-Rivas, 151 F.3d 377, 380 (5th Cir. 1998).

The district court determined that although the truck was first sighted by the agents approximately 75 miles from the border, the activation of vehicle sensors in an area much less than 50 miles from the border, the absence of major roads intersecting Highway 385 between the border and the point where the truck was first sighted, and the arrival of the vehicle at a time consistent with the sensor alerts "unquestionably indicate[d]" that the truck was traveling through an area very close to the border prior to the stop.  The district court's finding in this regard was not clearly erroneous; the finding is plausible in light of the record as a whole.  Inocencio, 40 F.3d at 721.  The district court went on to conclude that the proximity-to-the-border element supported the agents' reasonable suspicion determination.

Jacquinot asserts that the proximity-to-the-border factor should weigh against a finding of reasonable suspicion, as the agents had no reason to believe that his truck had recently crossed the border.  However, given the district court's accepted factual finding that the precipitate events clearly indicated that the truck had traveled through an area very close to the border prior to the stop, the agents did in fact have a reason to

9

believe that the truck had recently crossed the border.
Therefore, this factor does provide support for the stop.  Cf.
Melendez-Gonzalez, 727 F.2d at 411 (rejecting proximity-to-the-
border factor where vehicle was stopped 60 miles from border and
there was no independent reason to believe that the vehicle had
not started its journey in either of the two towns between the
border and the area of the stop).

Characteristics of the area

Based on Agent Graham's testimony that Highway 385 has a
reputation as a smuggling route, the district court concluded
that the characteristics of the area supported a finding of
reasonable suspicion.  While Jacquinot does not dispute that
Highway 385 is a notorious smuggling route, he notes that it is
also a major highway used by thousands of visitors to Big Bend
National Park, citing Rodriguez-Rivas, 151 F.3d at 380.  And he
points out that this court has cautioned that a vehicle's mere
presence on a road frequently used for illegal activity is not
sufficient to justify a stop, citing United States v. Diaz, 977
F.2d 163, 165 (5th Cir. 1992).

Nevertheless, "[i]t is well established that a road's
reputation as a smuggling route adds to the reasonableness of the
agents' suspicion."  Zapata-Ibarra, 212 F.3d at 881-82 (emphasis
added) (quotation and citation omitted).  This factor weighs in
favor of reasonable suspicion.

Usual traffic patterns

Agent Graham testified that traffic is typically very light coming out of Big Bend before six o'clock in the morning and that he was surprised to see a work truck leaving the park so early on a Sunday morning. The district court thus considered the truck's presence on the highway at that time to be a deviation from the typical traffic patterns that added to reasonable suspicion.

Jacquinot argues that leaving Big Bend early in the morning should not contribute to reasonable suspicion. He notes that Agent Graham testified that it was not unusual for park visitors to get an early start on their trip home. However, Agent Graham specifically testified that he did not believe he had ever seen a work vehicle leave the park on a Sunday morning and that such vehicles typically leave in groups at the end of the work day or work week. The traffic-pattern factor weighs in favor of reasonable suspicion.

### Agents' previous experience in detecting illegal activity

Agent Graham testified that he had three years' experience serving as a Border Patrol agent in the Alpine area and that Agent Snodgrass had eleven years' experience as a Border Patrol agent, with a few months of that experience in the Alpine area. The district court concluded that the agents' previous experience in the region contributed to the reasonable suspicion determination. This factor supports the stop.

### Behavior of the driver

Agent Graham testified that as he followed the truck, it: slowed dramatically to fifteen miles per hour below the speed

11

limit, although it had not previously been speeding; remained stopped at a stop sign for five seconds; made an unusual turn and traveled toward Alpine on an indirect route; and obeyed a school zone sign that limited speeds while flashing, although the sign was not then flashing. The district court concluded that the driver's behavior added to the agents' reasonable suspicion.

Jacquinot argues that it was not suspicious for the truck to slow down after Agent Graham followed it within two car lengths, passed it, and then got behind it again. He further contends that it would not be unusual for a prudent out-of-state traveler to stop at the Highway 385 and Highway 90 intersection for five seconds to determine the way to the nearest town, which was Alpine, or to travel at Highway 90's posted speed limit of 20 miles per hour.

Although deceleration in the presence of a patrol car may be completely innocent behavior, this court has noted that such behavior may be suspicious if the driver was not speeding when first observed. See Villalobos, 161 F.3d at 291. And while it is questionable whether the truck's five-second pause at the stop sign and adherence to the school zone speed limit were especially suspicious, the truck's indirect travel route from Big Bend to Alpine does trigger suspicion. See Zapata-Ibarra, 212 F.3d at 884 (approving the district court's consideration of an indirect route as a factor supporting reasonable suspicion). This court affords due weight to the inferences law enforcement officers draw from historical facts and the events leading up to a stop.

12

<u>Id.</u> Considering the totality of the driver's behavior, this factor weighs in favor of reasonable suspicion.

<u>Particular aspects of the vehicle</u>

Agent Graham testified that the truck: was not a tourist-type vehicle, but a work vehicle carrying tool boxes, a gas tank, and an air tank; did not have a park sticker on its windshield, indicating that it had not been in any tourist areas of the park for any length of time; and bore a Kansas license plate, although the park uses local contractors. The district court did not err in determining that the appearance of the truck contributed to the agents' reasonable suspicion.

Although the district court did not specifically address it, the factor regarding information about recent illegal trafficking in aliens or narcotics in the area is also relevant in this case. Agent Graham testified that he was personally aware of "a lot of" recent narcotics smuggling taking place through the Alpine area that was destined for locations in Kansas. Since the truck in question bore a Kansas license plate, this information weighs in favor of Agent Graham's reasonable suspicion determination.

Finally, as there is no indication in the record that Jacquinot, the truck's only passenger, caused any suspicion, the factor regarding the number, appearance, and behavior of the passengers is the sole factor that does not support the agents' reasonable suspicion determination. <u>See</u> <u>Zapata-Ibarra</u>, 212 F.3d at 884 (stating that not every <u>Brignoni-Ponce</u> factor need weigh in favor of reasonable suspicion and that an officer need not

13

eliminate all reasonable possibility of innocent travel before conducting an investigatory stop).

Viewing the evidence in the light most favorable to the Government and considering the totality of the circumstances, the district court did not err in denying Jacquinot's motion to suppress, as the border patrol agents' stop of the truck in which he was riding was based on reasonable suspicion that the truck's occupants were engaged in illegal activity. See id. at 881; Inocencio, 40 F.3d at 721.

**b. Upward adjustment for weapon possession**

Jacquinot also contends that the district court erred in applying § 2D1.1(b)(1)'s two-level upward adjustment for possession of a weapon in connection with a drug trafficking offense. Jacquinot argues that although there were two unloaded handguns in the truck, the Government failed to prove that it was not clearly improbable that he possessed those handguns in connection with his drug offense.

The district court's decision to apply § 2D1.1(b)(1) is a factual determination reviewable for clear error. United States v. Westbrook, 119 F.3d 1176, 1192-93 (5th Cir. 1997). Section 2D1.1(b)(1) provides for a two-level increase in the offense level for a drug trafficking offense "[i]f a dangerous weapon (including a firearm) was possessed." "The government has the burden of proof under § 2D1.1 of showing by a preponderance of the evidence that a temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant."

14

<u>United States v. Vasquez</u>, 161 F.3d 909, 912 (5th Cir. 1998) (internal quotation and citation omitted). "Applying this standard, the government must provide evidence that the weapon was found in the same location where drugs or drug paraphernalia are stored or where part of the transaction occurred." <u>Id.</u> (internal quotation and citation omitted). The § 2D1.1(b)(1) adjustment should be applied if the weapon was present, unless the defendant establishes that it was clearly improbable that the weapon was connected with the offense. <u>See</u> § 2D1.1(b)(1), comment. (n.3); <u>United States v. Marmolejo</u>, 106 F.3d 1213, 1216 (5th Cir. 1997).

A PSR is generally considered sufficiently reliable to be considered by the trial court as evidence in making the factual determinations required by the sentencing guidelines. <u>United States v. West</u>, 58 F.3d 133, 138 (5th Cir. 1995). In the present case, the district court adopted the PSR's findings that 286.44 pounds of marijuana were found in a toolbox in the bed of the truck in which Jacquinot was riding and that two unloaded handguns were found in the cab of the truck. Jacquinot does not contest these findings and even acknowledges that ammunition was also found in the truck. Accordingly, the district court did not err, clearly or otherwise, in finding that § 2D1.1 was applicable because there was a temporal and spatial relationship between Jacquinot, the guns, and his drug trafficking offense. <u>See</u> <u>United States v. Brown</u>, 217 F.3d 247, 261 (5th Cir. 2000) (applying § 2D1.1(b)(1) adjustment where shotgun found in truck

of vehicle used to transport drugs), vacated on other grounds by Randle v. United States, 121 S. Ct. 1072 (2001); United States v. Musquiz, 45 F.3d 927, 929, 932 (5th Cir. 1995) (applying § 2D1.1(b)(1) adjustment where gun found under the seat of car used in attempted theft of narcotics).

There is no merit to Jacquinot's argument that because he was not charged with the 18 U.S.C. § 924(c)(1) offense of possessing a firearm in furtherance of a drug trafficking offense and because Agent Snodgrass' memo stated that the guns were not loaded, no attempt was made to use them, and there was no evidence that the guns had been intended for use against law enforcement officers, it is clearly improbable that the guns were connected to his drug trafficking offense. For purposes of the § 2D1.1(b)(1) adjustment, "[i]t is not necessary for possession of the weapon . . . to be sufficiently connected with the crime to warrant prosecution as an independent firearm offense." United States v. Villarreal, 920 F.2d 1218, 1221 (5th Cir. 1991). And it is not material that the guns were not loaded; 2D1.1(b)(1) is an added punishment for drug offenders who heighten the danger of drug trafficking by possessing a dangerous weapon, and the mere presence of a gun, loaded or not, can escalate the danger. See United States v. Mitchell, 31 F.3d 271, 278 (5th Cir. 1994). Finally, it does not matter whether Jacquinot actually used or intended to use the guns in his drug-trafficking offense; the pertinent fact is that "they could have been so used." United

16

States v. Menesses, 962 F.2d 420, 429 (5th Cir. 1992) (emphasis added).  Jacquinot's sentence must therefore be affirmed.

### III. CONCLUSION

Based on the foregoing, we affirm Jacquinot's conviction and sentence.

AFFIRMED.

17

ROBERT M. PARKER, Circuit Judge, specially concurring.

The absurdity of our Fourth Amendment jurisprudence, as it relates to the southern border area of Texas, is well illustrated by Judge Wiener's dissent in *United States v. Zapata-Ibarra*. In addition to the factual scenarios he lists in his dissent that we have judicially blessed, we can now add spending five seconds at a  Stop sign prior to turning left, and driving 20 mph through a school zone when the blinking light was off.

The stop was seventy-five miles from the border, well beyond our artificial fifty mile limit. There is no evidence that the truck had crossed the border. The articulated reason of lead car/following car had been dispelled, a fact which decreases the relevance that at some point (undisclosed for security purposes) within the park two vehicles passed a sensor. The officers also mentioned the highly suspicious slowing within the speed limit as the defendants were being followed and the Kansas license plate on the vehicle. This last point had particular significance for one of the officers, since at one point in his career he made a case involving a Kansas destination.

I find no rational or principled basis upon which to conclude that either reasonable suspicion or probable cause existed that would justify the stop in this case. I choose to specially concur because I recognize that at this point in time, in this circuit, a dissent would be an exercise in futility. I remain hopeful that at some point in time, the hysteria regarding

18

the ill-fated war on drugs and its impact on the Fourth Amendment will subside and the rule of reason will again prevail.

ROBERT M. PARKER, Circuit Judge, specially concurring.


The absurdity of our Fourth Amendment jurisprudence, as it relates to the southern border area of Texas, is well illustrated by Judge Wiener's dissent in *United States v. Zapata-Ibarra*. In addition to the factual scenarios he lists in his dissent that we have judicially blessed, we can now add spending five seconds at a Stop sign prior to turning left, and driving 20 mph through a school zone when the blinking light was off.

The stop was seventy-five miles from the border, well beyond our artificial fifty mile limit. There is no evidence that the truck had crossed the border. The articulated reason of lead car/following car had been dispelled, a fact which decreases the relevance that at some point (undisclosed for security purposes) within the park two vehicles passed a sensor. The officers also mentioned the highly suspicious slowing within the speed limit as the defendants were being followed and the Kansas license plate on the vehicle. This last point had particular significance for one of the officers, since at one point in his career he made a case involving a Kansas destination.

I find no rational or principled basis upon which to conclude that either reasonable suspicion or probable cause existed that would justify the stop in this case. I choose to specially concur because I recognize that at this point in time, in this circuit, a dissent would be an exercise in futility. I remain hopeful that at some point in time, the hysteria regarding

20

the ill-fated war on drugs and its impact on the Fourth Amendment will subside and the rule of reason will again prevail.