United States Court of Appeals
Fifth Circuit

**F I L E D**

**November 2, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 05-40468

_____

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

versus

JORGE VALENCIA FARIAS; ADRIAN VALENCIA FARIAS,

                                        Defendants-Appellants.

_____

Appeals from the United States District Court
for the Eastern District of Texas
USDC No. 5:03-CR-50038-1

_____

Before HIGGINBOTHAM, DENNIS, and CLEMENT, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

A jury convicted defendants, brothers Jorge and Adrian Farias, of conspiracy to manufacture and distribute illegal drugs. On appeal, Jorge argues that a prior plea agreement should have precluded his prosecution. Jorge and Adrian both argue insufficient evidence and improper sentencing. We AFFIRM the convictions and sentences.

I

On September 18, 2002, Jorge Farias drove an associate named Nadim Safdar and two other men to Lewisville, Texas to collect a drug debt. While Safdar tried to collect from the customer inside

the customer's house, Jorge and the other men, waiting outside in the car, blew the horn and yelled.  When Safdar returned to the car, Lewisville police officers arrived, responding to a call that people were hollering in the street.  Noticing that the car was parked the wrong way and the smell of burning marijuana, the officers asked the men to exit the car while they searched it.

The officers saw, on the floorboard of the driver's side, where Jorge had been sitting, a pair of brown gloves with the open ends back-to-back.  Picking up the gloves, they found a semi-automatic pistol hidden inside.  They arrested Jorge for unlawfully carrying the gun and, while searching the car incident to that arrest, found drug distribution paraphernalia and about 100 grams of methamphetamine.[1]

While Jorge was in Denton County Jail, a jail officer called the INS and reported Jorge's arrest.  The INS investigated and, on December 11, 2002, a federal grand jury in the Eastern District of Texas indicted Jorge for illegal reentry after removal.  On January 29, 2003, Jorge plead guilty pursuant to a plea agreement containing the following clauses:

> 4. [Jorge agrees to]: "fully, completely and honestly cooperate with the United States in its ongoing investigation by giving interviews to [the INS] and testimony before the grand jury and during the trial of this or any related investigation."

---

[1] Jorge eventually plead guilty in state court, in July 2003, to a possession with intent to distribute charge stemming from this incident and was sentenced to two years imprisonment.

9. [The Government agrees not to:] "charge [Jorge] with any other criminal violations concerning activities committed prior to the date of this agreement which the Defendant makes known to the United States and which do not involve crimes of violence or Title 26 offenses.

11. [Both parties agree that:] "this agreement contemplates the full and honest cooperation of [Jorge] at all times...."

13. [Both parties agree that:] "each party will be bound by the agreement only if all conditions set forth herein are met."

Meanwhile, Jorge's brother Adrian was also dealing drugs. Denton, Texas police officers arrested him on March 16, 2000 during a sting, after which he was found with 897.67 grams of methamphetamine mixture, and Dallas police officers arrested him on November 18, 2003 for public intoxication, after which he was found with heroin, in a pill bottle similar to that used by other family members dealing drugs.

Throughout this time, and through several stings from 1999 to 2003, the Government was piecing together an extensive drug distribution conspiracy involving defendants and various spouses, girlfriends, and other relatives and headed by older brother Jesus ("Chuy"). On October 14, 2004, a federal grand jury in the Eastern District of Texas indicted Jorge, Adrian, and several other co-defendants for conspiracy with intent to manufacture and distribute amphetamine, methamphetamine, heroin, cocaine, and marijuana from 1999 through October 14, 2004. Citing the September 28, 2002 incident, it also indicted Jorge under 18 U.S.C. § 924(c)(1) for using or carrying a firearm during a drug trafficking crime.

3

Jorge moved to dismiss the conspiracy count, arguing that his earlier plea agreement precluded it. The district court denied the motion. A jury found both defendants guilty of conspiracy but acquitted Jorge of the gun charge. The court sentenced Adrian to 120 months and Jorge to 121 months after denying Jorge's request for an adjustment for acceptance of responsibility and finding that he possessed a gun during the underlying conspiracy offense.

## II

Jorge notes that the Government must have known of the September 18 drug arrest at the time of his plea agreement because that arrest led to the INS investigation, immigration indictment, and eventual plea. Therefore, he contends, the Government knew at that time of the "offenses subsequently charged against [him]" in this case, hence paragraph nine of the agreement precludes his prosecution for conspiracy. He also vaguely asserts that double jeopardy precludes that prosecution.[2]

We review *de novo* whether the Government breached a plea agreement, accepting the district court's factual findings unless clearly erroneous.[3] We construe the agreement like a contract, seeking to determine the defendant's "reasonable understanding" of

---

[2] He does not develop this claim. In any event, double jeopardy has no application here — the Government did not prosecute Jorge for the same crime twice.

[3] *See United States v. Davis*, 393 F.3d 540, 546 (5th Cir. 2004). We also review *de novo* the denial of a motion to dismiss an indictment, *see United States v. Wilson*, 249 F.3d 366, 371 (5th Cir. 2001), the vehicle for the plea agreement claim here.

4

the agreement and construing ambiguity against the Government.[4]

Jorge's argument fails because the plea agreement precludes prosecution only for crimes "ma[d]e known" by Jorge, and Jorge did not "make known" the conspiracy. The Government discovered it through independent investigation. And some of the individual acts proving the conspiracy relied on by the Government at trial occurred after the plea agreement. Of course the Government can grant transactional immunity,[5] it did not do so here. We find no ambiguity: Jorge's plea agreement did not preclude his later indictment for conspiracy.

## III

Jorge and Adrian both argue here the sufficiency of the evidence and at trial moved for judgment of acquittal at the close

---

[4] Plea agreements are contractual. *See, e.g.*, *Hentz v. Hargett*, 71 F.3d 1169, 1173 (5th Cir. 1996). The Government must fulfill its end of the bargain, *see, e.g., Santobello v. New York*, 404 U.S. 257, 262 (1971), even if the sentencing judge expressly disclaims reliance on any promise by the Government, *see, e.g., United States v. Grandinetti*, 564 F.2d 723, 727 (5th Cir. 1977), the Government actor breaching the agreement is unaware of the agreement, *see, e.g., United States v. Saling*, 205 F.3d 764, 768 (5th Cir. 2000), or the breach is otherwise inadvertent, *see, e.g., United States v. Ewing*, 480 F.2d 1141, 1143 (5th Cir. 1973). When construing an agreement, courts should look to the nature of the agreement and the defendant's "reasonable understanding" of it*, see, e.g., United States v. Valencia*, 985 F.2d 758, 761 (5th Cir. 1993), and any ambiguity must be resolved against the Government, *see, e.g., United States v. Somner*, 127 F.3d 405, 408 (5th Cir. 1997). If the Government breaches an agreement, an appellate court can vacate the conviction, remand for resentencing, or remand for specific performance of the plea. *See Petition of Geisser*, 554 F.2d 698, 706 (5th Cir. 1977).
Jorge cites some interesting applications of the above rules, *see, e.g., United States v. Randolph*, 230 F.3d 243 (6th Cir. 2000) (where federal prosecutors in Texas limited plea agreement to their district and then informed their Tennessee counterparts of defendant's actions, enforcing plea agreement in Tennessee), these peculiar cases are irrelevant here.

[5] *See United States v. Castaneda*, 162 F.3d 832, 839 (5th Cir. 1998).

5

of all evidence.  Hence we "view[] the evidence in the light most favorable to the prosecution," asking whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[6]

To prove conspiracy, the evidence must show: 1) an agreement between the defendant and one or more people to violate the drug laws; 2) that the defendant knew of the conspiracy and intended to join it; and 3) that the defendant voluntarily participated in the conspiracy.[7]  "An express agreement is not required; a tacit, mutual agreement with common purpose, design, and understanding will suffice."[8]  Because secrecy is the norm, each element may be established by circumstantial evidence.[9]

Jorge summarily attacks the proof on each element, arguing that the Government showed only "mere association" with the alleged co-conspirators and "mere presence" around drug activity, not an agreement, no knowledge of a conspiracy or its objective, and no voluntary participation.  He does not mention the Government's evidence, aside from stating that "[t]he [G]overnment's main witness indicated that she did not know [Jorge]."  He focuses the rest of his argument on "interdependence," citing various Tenth

---

[6] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

[7] *See United States v. Infante*, 404 F.3d 376, 385 (5th Cir. 2005).

[8] *See id.*

[9] *See id.*

6

Circuit cases requiring that a co-conspirator rely on the conduct of others and facilitate the endeavors of other co-conspirators or the venture as a whole. Essentially, he argues that a bunch of drug dealers with the same desire operating in the same area are not, without more, co-conspirators, even if they sell to or buy from the same people — in the vernacular, it is a rimless conspiracy.

Sufficient evidence supported the verdict. In addition to damning testimony by several of Jorge's acquaintances, describing, for example, how Jorge supplied drugs to Miguel Nava after Adrian stopped doing so and how Chuy helped collect Safdar's debt to Jorge after Jorge was jailed, the Government introduced jailhouse tapes revealing that Jorge, Adrian, Chuy and others discussed drug-debt collection attempts, territory, strategies to avoid police, price per ounce for methamphetamine, how to cut methamphetamine with cheaper substances, and a specific drug deal involving Adrian and Chuy. Furthermore, although we do not explicitly require "interdependence" in this circuit, there was plenty of evidence of "interdependence" here. In sum, a jury could easily find that Jorge was more than just a lone dealer operating in the same area as other dealers.

Adrian fares no better. Most of his argument parallels Jorge's and fails for the same reason. There is one wrinkle. The conspiracy spanned his eighteenth birthday, and the Government must show that the alleged conspirator ratified his involvement in the

7

conspiracy after that birthday.[10]  Adrian argues that his conviction, like his eventual sentence, rests solely on his March 16, 2000 arrest, which occurred four days before his eighteenth birthday.  Although that arrest was the focus of the case against Adrian, the Government presented much evidence that Adrian conspired after that arrest, including testimony that Adrian discussed drug sales on the telephone in Chuy's house in 2003, sold drugs as part of the conspiracy in 2003, discussed sales and debt collection with Chuy while Chuy was in jail in 2002 and 2003, and was arrested with heroin, in pill bottles similar to that used by co-conspirators, in 2003.  Adrian attacks the weight and credibility of much of this evidence, but such attacks are improper on sufficiency review.[11]  In short, the evidence shows that Adrian, like his brother, participated in an extensive conspiracy through at least 2003.

IV

Both defendants objected to their PSRs and sentences, renewing those objections here.  We review *de novo* the district court's interpretation of the Guidelines, although we review attending factual determinations for clear error and the court's refusal to find acceptance of responsibility even more deferentially,

---

[10] *See United States v. Tolliver*, 61 F.3d 1189, 1200 (5th Cir. 1995).

[11] *See, e.g., United States v. Harris*, 420 F.3d 467, 473 (5th Cir. 2005).

8

disturbing it only if it is "without foundation."[12]  Post-*Booker*, we ultimately review the sentences for reasonableness, although a sentence within a properly calculated Guidelines range is presumptively reasonable.[13]

A

Jorge attacks his sentence on two fronts.  He contends first that the district court erred in enhancing his sentence under U.S.S.G. § 2D1.1(b)(1) for possessing a dangerous weapon during a drug offense, for which it cited the gun found in Jorge's car during his September 18, 2002 arrest.  Jorge contends that the court erred in using the preponderance of the evidence standard instead of the beyond a reasonable doubt standard because the jury acquitted him of using or carrying the gun during that arrest.  Acknowledging that the Supreme Court, in the pre-*Booker* case *United States v. Watts*, allowed district courts to find by a preponderance of the evidence facts contradicting jury findings,[14] he argues that *Booker* implicitly overruled *Watts*, citing a few district courts which have so held or hinted.[15]  In any event, Jorge argues, there

---

[12] *United States v. Chavez*, 119 F.3d 342, 348 (5th Cir. 1997); *United States v. Maldonado*, 42 F.3d 906, 913 (5th Cir. 1995).

[13] *See United States v. Mares*, 402 F.3d 511, 519 (5th Cir. 2005).

[14] 519 U.S. 148, 157 (1997).

[15] *See United States v. Pimental*, 367 F. Supp. 2d 143, 145 (D. Mass. 2005); *United States v. Coleman*, 370 F. Supp. 2d 661, 668 (S.D. Ohio 2005); *United States v. Gray*, 362 F. Supp. 2d 714, 720 (S.D.W. Va. 2005); *United States v. Huerta-Rodriguez*, 355 F. Supp. 2d 1019, 1027 (D. Neb. 2005).

is insufficient evidence under either standard because there is nothing tying him to the gun other than its presence on the floor of the car where he had been sitting, which is insufficient to show the requisite temporal and spatial proximity between him, the gun, and the crime.[16]

*Watts* survives *Booker*, and district courts must still determine sentencing facts by a preponderance of the evidence, even facts contradicting jury findings.[17]  Applying that standard, the district court did not clearly err because we have held that the enhancement should apply if "the weapon was found in the same location where the drugs or drug paraphernalia [were] stored or where part of the transaction occurred"[18] unless "the defendant establishes that it was clearly improbable that the weapon was connected with the offense."[19]  Here, the gun was found underneath the seat where Jorge had been sitting, near methamphetamine in the trunk, on the way to what one of Jorge's passengers later testified was a drug debt collection, and Jorge offered no evidence to rebut

---

[16] *See United States v. Cooper*, 274 F.3d 230, 245 (5th Cir. 2001).

[17] *See United States v. Alonzo*, 435 F.3d 551, 553 (5th Cir. 2006); *United States v. Mares*, 402 F.3d 511, 519 (5th Cir. 2005) ("The sentencing judge is entitled to find by a preponderance of the evidence all facts relevant to the determination of a Guideline sentencing range and all facts relevant to the determination of a non-Guideline sentence.")

[18] *United States v. Cooper*, 274 F.3d 230, 245 (5th Cir. 2001).

[19] *United States v. Jacquinot*, 258 F.3d 423, 430-31 (5th Cir. 2001) (citing U.S.S.G. § 2D1.1, cmt. 3).

10

the resulting inference.[20]

Jorge argues second that the district court erred in refusing to adjust his sentence downward for acceptance of responsibility after noting that he contested guilt by going to trial. Quoting a note to the Guidelines, Jorge urges that going to trial does not automatically preclude the adjustment because there are "rare situations" where a defendant, by going to trial not to contest factual guilt, but to argue an unrelated issue, "may clearly demonstrate an acceptance of responsibility...even though he [goes to trial.]"[21] His case presents such a situation, he argues, because he went to trial only to preserve his claim that his prior plea agreement precluded prosecution here. Indeed, he contends, he effectively admitted factual guilt by pleading guilty in state court, before he was even indicted here, to a possession with intent to distribute count stemming from the September 18 incident.

Jorge's case is not one of those "rare situations" because Jorge never admitted factual guilt of the charged crime, unlike the defendants in the cases he cites who went to trial only to pursue an entrapment defense, challenge venue, or test the Government's ability to prove its case after the defendant entered an *Alford*

---

[20] Jorge suggests that the Government bears the burden of establishing that a connection between the gun and the offense was not clearly improbable, but *Jacquinot* clearly places the burden on Jorge. *See id*. He also argues, citing *United States v. Cochran*, 14 F.3d 1128, 1133 (6th Cir. 1994), that the Government failed to prove his knowledge of the gun. We do not require such proof.

[21] U.S.S.G. § 3E1.1, cmt. 2.

plea.[22]  In such cases the defendants did not go to trial on factual

guilt; Jorge did.  Moreover, Jorge did not effectively admit guilt

by pleading guilty in the state case because the state charge, more

easily proven, had significantly different elements than the

conspiracy charge here.  Finally, Jorge did not go to trial to

preserve his plea agreement argument — after the court ruled on

that issue, he could have asked for a conditional plea allowing him

to appeal that ruling, a request he never made.[23]  The court's

refusal to find acceptance of responsibility was not without

foundation.

B

The jury found Adrian responsible for 897.67 grams of

methamphetamine mixture.  This, combined with his criminal history,

resulted in a Guidelines range of 121 to 151 months.  In addition,

his general statute of conviction, 21 U.S.C. § 841, provided

mandatory minimums: 10 years for 50 or more grams of

methamphetamine or 500 or more grams of methamphetamine mixture (§

---

[22] *See United States v. Fleener*, 900 F.2d 914, 918 (6th Cir. 1990) (entrapment); *United States v. Fells*, 78 F.3d 168, 172 (5th Cir. 1990) (venue); *United States v. Tucker*, 925 F.2d 990, 992-93 (6th Cir. 1991) (*Alford* plea).

[23] *See United States v. Washington*, 340 F.3d 222, 230 (5th Cir. 2003) ("*In the absence of a conditional plea*, the defendant would have to choose between trying to suppress the evidence and receiving credit for acceptance of responsibility." (emphasis added)); *United States v. Solis*, 299 F.3d 420, 458 (5th Cir. 2002) (affirming denial of adjustment where defendant argued that he had been willing to plead guilty, but wanted to challenge pretrial motions, had plead guilty in other proceedings to several similar charges, and had admitted essential elements of crime, yet went to trial); *United States v. Williams*, 74 F.3d 654, 657 (5th Cir. 1996) (adjustment might have been proper if defendant had informed the government that he would be pleading guilty if suppression motion was denied, rather than plead guilty on the day of trial).

12

841(b)(1)(A)), and 5 years for 5 to 50 grams of methamphetamine or 50 to 500 grams of methamphetamine mixture (§ 841(b)(1)(B)). The court sentenced Adrian to 120 months, below the Guidelines range, citing the 18 U.S.C. § 3553 reasonableness factors. It did not specifically mention a mandatory minimum. Adrian appeals, arguing that the court improperly thought itself restricted by the 10-year minimum and would have sentenced him lower if it knew it had the discretion to do so.[24]

Adrian argues that the mixture, because it was 5% pure, contained only 44 grams of actual methamphetamine; under § 841(b)(1)(B), this actual amount yields only a 5-year minimum. Conceding that a note to the Guidelines directs courts to use the greater offense level resulting from either the actual or mixture amounts when calculating the Guidelines sentence,[25] he argues that the post-*Booker* advisory Guidelines now allow a court to choose either mandatory minimum, since the statute itself provides no direction and the Guidelines are advisory. In sum, Adrian argues, the court failed to realize it had discretion to choose between the 5-year and 10-year minimums; given the discretion, it would have chosen the former and sentenced him somewhere between 5 and 10 years.

---

[24] He concedes that the court never pinned its 120-month sentence on its belief in the applicability of the 10-year mandatory minimum, but he argues that the implication is clear. We agree, since otherwise the one month departure (from 121 to 120 months) seems peculiar.

[25] U.S.S.G. § 2D1.1, cmt. B.

13

Adrian does not argue that a judge has discretion under *Booker* to sentence below a mandatory minimum, a proposition this and other courts have rejected;[26] rather, he argues that which mandatory minimum applies is unclear, since § 841 itself does not specify which measure to use — actual amount or mixture amount — when more than one apply, and only the Guidelines, now advisory, provide direction. Yet which minimum applies is not in dispute — the indictment charged, and the jury found Adrian guilty of, § 841(b)(1)(A), not § 841 in general, triggering the ten-year minimum. Adrian's *Booker* argument confuses the mandatory minimums with the Guidelines — while a sentencing judge has no discretion to choose which minimum applies when a defendant is convicted of a certain § 841 offense, he does have "discretion"[27] to predicate the Guidelines base offense level for that conviction on either of two different measures of drugs, pure or mixture, regardless of which § 841 offense the defendant was convicted or what measure the Government proved to get that conviction. But whatever result the Guidelines yield, the sentence cannot be less than the mandatory minimum. Because Adrian received the mandatory minimum, he has no

_____

[26] *See United States v. Payton*, 405 F.3d 1168, 1173 (10th Cir. 2005); *United States v. Robinson*, 404 F.3d 850, 862 (4th Cir. 2005); *United States v. Vieth*, 397 F.3d 615, 620 (8th Cir. 2005); *United States v. Sepulveda-Rodriguez*, 157 Fed. Appx. 765, 766 (5th Cir. 2005).

[27] Of course, under the Guidelines, the sentencing judge has "discretion" only to use the measure resulting in the higher offense level. And *Booker* does not change that, since judges must still calculate the Guidelines range as they always have; *Booker* simply imparts additional discretion afterwards. *See Mares*, 402 F.3d at 519.

14

argument on appeal.

AFFIRMED.