# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 10, 2008

Charles R. Fulbruge III
Clerk

No. 07-51046

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

JOSE MARTIN MEDINA

Defendant - Appellant

Consolidated with
No. 07-51062

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

ROLANDO RENDON

Defendant - Appellant

Appeals from the United States District Court
for the Western District of Texas
USDC No. 4:07-CR-14-2
USDC No. 4:07-CR-14-RAJ-1

Before DAVIS, CLEMENT, and ELROD, Circuit Judges.

PER CURIAM:[*]

Jose Martin Medina and Rolando Rendon (together, the "Appellants") appeal the denial of their motions to suppress the physical evidence and post-arrest statements obtained following an investigatory stop and search of the vehicle they occupied. For the following reasons, we affirm.

## I. FACTS AND PROCEEDINGS

On January 10, 2007, Agent Brian Scholz, from the Marfa, Texas Border Patrol station, was patrolling Highway 90 in an area known for being a "pick-up" spot for illegal immigrants having just crossed the border. He noticed a silver Ford Mustang leaving the emergency lane of the highway, where it had been parked, and pulling into the traffic lane. Scholz conducted a traffic stop. During questioning, the driver gave inconsistent and suspicious answers regarding the vehicle's prior whereabouts. In particular, he denied having come from Mexico, but a lane check conducted by Scholz—which verifies whether a license place has come through a port of entry— revealed that the vehicle had crossed the border a few hours before the stop. When a consensual search of the vehicle yielded no illegal aliens or contraband, the car and its occupants were released. Approximately an hour later, as Scholz continued his patrol on Highway 90, he stopped a red Chevrolet Cavalier that was similarly beginning to pull away from the side of the road after his marked Border Patrol vehicle came into view. Again, the occupants made statements inconsistent with Scholz's lane check of the vehicle, but a search of the car failed to uncover anything illegal, and its occupants were released.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Soon after the Cavalier was released, Border Patrol agents received sensor indications that a vehicle traveling north on FM 2810—a notorious alien and drug smuggling route—had exited FM 2810 onto a private ranch road heading towards Highway 90. During the suppression hearing, Scholz testified that the private ranch roads in the area are dirt paths on which it is unusual for the public to travel; they are frequently used by vehicles attempting to avoid Border Patrol units on FM 2810. The particular road identified by the sensor hit also circumvented the nearest border checkpoint. Border Patrol agents patrolling along Highway 90 attempted to intersect the vehicle that had traveled down the ranch road but were unsuccessful.

On January 15, 2007, Scholz was assigned to the Border Patrol checkpoint on Highway 67, the closest checkpoint to the location of the stops conducted on January 10. He noticed the same silver Ford Mustang he had stopped five days earlier pull into the checkpoint, but with a different driver. Again, the vehicle was searched and released. Border Patrol agents trailed the vehicle, which was later observed parked near FM 2810. About an hour later, the red Cavalier that Scholz had previously stopped came through the checkpoint and was also searched and released. At this point, Border Patrol agents suspected that the two cars were serving as "scouting" vehicles for another vehicle transporting illegal aliens or contraband. The checkpoint asked Agent Clay Tippit—a Border Patrol helicopter pilot employed at the Marfa station—to remain on standby.

Approximately an hour later, the Border Patrol received sensor indications that a vehicle was coming up the same route of travel on FM 2810 as the unidentified vehicle on January 10. Tippit flew his helicopter over the same private ranch road that agents had investigated five days earlier. He noticed a pick-up truck traveling at a high rate of speed on the bumpy road, and approached the vehicle close enough to read its license plate. The truck was

loaded with what appeared to be feed sacks and a saddle. However, Tippit testified that the feed sacks had been neatly positioned to cover the entire bed of the truck and that he had never seen ranchers load feed sacks in that way. Upon closer observation, he determined that the feed stacks had been laid out on a mat, which was hiding other packages underneath. Tippit notified Scholz, who was heading towards the ranch road in a 4-by-4 vehicle, that he had spotted a vehicle moving quickly and transporting a suspicious load. At one point, the driver briefly stopped and exited the truck to watch the helicopter, leaving his right arm hidden from view, which prompted Tippit to warn Scholz that the driver may be armed and dangerous. After a few minutes, the driver got back in the truck and continued traveling on the ranch road at a slower pace. By the time Scholz arrived at the scene, the pick-up truck had come to a complete stop. At the suppression hearing, Tippit and Rendon presented conflicting accounts of how the vehicle eventually came to a final stop. While Tippit testified that the vehicle stopped voluntarily, Rendon stated that Tippit ordered him to stop from the helicopter using his loud speaker and hand gestures.

When Scholz and another Border Patrol agent arrived at the location where the pick-up truck was stopped, they ordered its occupants—Medina, the driver, and Rendon, the passenger—to get out of the vehicle and handcuffed them. Tippit landed his helicopter nearby and approached the vehicle. Through the open door, he noticed brown, cellophane wrapped bundles, which appeared to be marijuana, underneath a blanket in the back of the cab. Scholz also observed that the cab contained apparent marijuana bundles. The pick-up truck was driven back to the Marfa checkpoint for an in-depth search, which uncovered 389 bundles of marijuana located in the rear cab and the bed of the truck.

Medina and Rendon were charged with (1) possession with intent to distribute 100 kilograms or more, but less than 1,000 kilograms, of marijuana, in violation of 21 U.S.C. § 841(a)(1); and (2) aiding and abetting, in violation of 18 U.S.C. § 2. They filed motions to suppress the narcotics evidence seized from the truck and the statements made after their arrest. Following a suppression hearing, the district court denied the motions to suppress on April 30, 2007. It held that the stop was warranted by reasonable suspicion, and that the agents had probable cause to search the truck. Medina and Rendon entered into conditional plea agreements in which they preserved their right to appeal the district court's ruling on their motions to suppress. They were each sentenced to 120-months of imprisonment. They filed timely notices of appeal challenging the district court's denial of their motions to suppress, and their appeals were consolidated by this court.

## II. STANDARD OF REVIEW

In an appeal of a ruling on a motion to suppress evidence, this court reviews "the district court's . . . legal conclusions, including its ultimate conclusion as to the constitutionality of the law enforcement action, de novo." United States v. Chavez, 281 F.3d 479, 483 (5th Cir. 2002). However, "the district court's factual findings are reviewed for clear error," and need only be "plausible in light of the record as a whole." United States v. Jacquinot, 258 F.3d 423, 427 (5th Cir. 2001). "Where a district court's denial of a suppression motion is based on live oral testimony, the clearly erroneous standard is particularly strong because the judge had the opportunity to observe the demeanor of the witnesses." United States v. Santiago, 410 F.3d 193, 197 (5th Cir. 2005). Further, the evidence presented at the suppression hearing must be viewed "in the light most favorable to the prevailing party." United States v. Stevens, 487 F.3d 232, 238 (5th Cir. 2007).

## III.  DISCUSSION

### A.  Reasonable Suspicion for the Stop[1]

It is uncontroverted that "[t]he stopping of a vehicle and detention of its occupants constitutes a 'seizure' under the Fourth Amendment."  United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004) (en banc).  Even "brief investigatory stops . . . must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."  United States v. Cortez, 449 U.S. 411, 417 (1981).  Therefore, "[a] border patrol agent conducting a roving patrol may make a temporary investigative stop of a vehicle only if the agent is aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicle's occupant is engaged in criminal activity."  Jacquinot, 258 F.3d at 427 (citing United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975)).

In determining whether a Border Patrol agent's investigative stop was supported by reasonable suspicion, this court, in accordance with Supreme Court guidance, considers the following factors:

> (1) proximity to the border; (2) characteristics of the area; (3) usual traffic patterns; (4) agent's previous experience in detecting illegal activity; (5) behavior of the driver; (6) particular aspects or characteristics of the vehicle; (7) information about recent illegal

---

[1] During the suppression hearing, Tippit testified that the occupants stopped the vehicle "on their own accord," without being ordered to do so by himself or any other Border Patrol agent.  Rendon contested this version of events and testified that Tippit used the loud speaker in his helicopter as well as hand gestures to stop the vehicle.  The government maintains that the stop was consensual and thus does not implicate the Fourth Amendment, and correctly notes that the district court found the testimony of the agents credible on this point.  The government nevertheless concedes that the district court did not decide the issue on this ground, instead holding that "[r]egardless of how the vehicle came to a stop, . . . the facts in this case establish reasonable suspicion to warrant a stop of the truck."  We need not assess the credibility of the witnesses on this point, because, even assuming that the Border Patrol agents ordered the vehicle to stop, we agree with the district court that the stop was supported by reasonable suspicion.

trafficking in aliens or narcotics in the area; and (8) the number, appearance, and behavior of the passengers.

Jacquinot, 258 F.3d at 427 (citing Brignoni-Ponce, 422 U.S. at 884–85). This reasonable suspicion analysis is a "fact-intensive test." Jacquinot, 258 F.3d at 427. "No single factor is determinative; the totality of the particular circumstances known to the agents are examined when evaluating the reasonableness of a roving border patrol stop." United States v. Hernandez, 477 F.3d 210, 213 (5th Cir. 2007). As explained below, our application of the Brignoni-Ponce factors and our review of the totality of the circumstances surrounding the stop support the district court's conclusion that reasonable suspicion existed.

Medina argues that the first factor—"proximity to the border"—is not satisfied here because the district court found that the vehicle was stopped approximately 65-70 miles from the Mexican border. Medina correctly notes that, in this circuit, "a car traveling more than 50 miles from the border is usually viewed as being too far from the border to support an inference that it originated its journey there." Jacquinot, 258 F.3d at 428. However, this court has also emphasized that it "does not adhere to a bright line test regarding distance to the border." Id. (holding that, when Border Patrol sensors were activated in an area less than fifty miles from the border, but the vehicle was first observed more than fifty miles from the border, the proximity test is satisfied). The proximity test can be satisfied "even when the vehicle is more than the benchmark fifty miles from the border . . . if other specific articulable facts support a finding of reasonable suspicion." Hernandez, 477 F.3d at 214. The record establishes that the pick-up truck was first sighted while moving at a high rate of speed on a surreptitious road heading north from the border, in an area known for smuggling of aliens and drugs originating in Mexico. Therefore,

we agree with the district court that the vehicle was sufficiently close to the border to contribute to the reasonableness of the Border Patrol agents' suspicion.

The second Brignoni-Ponce factor—"characteristics of the area"—also supports a finding of reasonable suspicion. While this court has cautioned that mere presence on a road frequently used for illegal activity is not sufficient to justify a stop, "[i]t is well established that a road's reputation as a smuggling route adds to the reasonableness of the agents' suspicion." Jacquinot, 258 F.3d at 429 (internal quotation and emphasis omitted). The Appellants concede that FM 2810 and the surrounding ranch roads are used for alien and narcotics smuggling activity. In addition, both Scholz and Tippit testified as to their preexisting knowledge that the area was frequented by smugglers who traveled along the private ranch roads in order to circumvent border patrols and checkpoints. Therefore, the district court correctly held that the characteristics of the area in which the Appellants were stopped—"along a ranch road in a barren area of West Texas" that is "notorious for alien and narcotics smuggling"—weighed in favor of reasonable suspicion.

With respect to the third factor, "usual traffic patterns" on the road where the Appellants were stopped, the testimony of Scholz and Tippit at the suppression hearing established that the ranch roads that connect to FM 2810 are private dirt roads where it is unusual for the public to travel. Scholz testified that the road on which the Appellants were traveling was at most a "two vehicle track" along the fence dividing two local ranches; while ranchers may occasionally travel on the path to inspect the fence line or look for cattle, it is "not used on a daily or weekly basis." Tippit similarly stated that "this wasn't even a ranch road," but merely a "fence line." As noted above, both agents also testified that the isolated ranch roads in the area were favored routes for smugglers, and the particular road on which Appellants were stopped

circumvented the nearest checkpoint and allowed its users to avoid border patrols on FM 2810. Therefore, this factor also supports a finding of reasonable suspicion.

"It is evident that an officer's experience," the fourth element examined by this court, "is a contributing factor in determining whether reasonable suspicion exists." United States v. Zapata-Ibarra, 212 F.3d 877, 882 (5th Cir. 2000) (internal quotation omitted). At the time of the suppression hearing, Scholz had almost nine years of experience as a Border Patrol agent for the Marfa station; Tippit had been a Border Patrol pilot for twenty-two years, including eight at the Marfa station. See Jacquinot, 258 F.3d 429 (finding that Border Patrol agent's three years of experience was sufficient to weigh in favor of reasonable suspicion). Both Scholz and Tippit gave extensive testimony regarding their familiarity with the local roads, including FM 2180 and the surrounding ranch roads, and Scholz described prior instances of stops of suspected smugglers. Therefore, the Border Patrol agents' experience contributed to the reasonableness of their suspicion.

Turning to the evidence on record concerning the "behavior of the driver," the fifth Brignoni-Ponce factor, we note that, according to Tippit's testimony, Medina was driving so fast on what amounted to little more than a "fence line" that the pick-up truck was "bouncing" along the road. In addition, after Medina briefly stopped the vehicle to observe the Border Patrol helicopter, he resumed driving at a slower speed. See Brignoni-Ponce, 422 U.S. at 885 (noting that "erratic driving or obvious attempts to evade officers can support a reasonable suspicion"); United States v. Villalobos, 161 F.3d 285, 291 (5th Cir. 1998) (noting that "noticeable deceleration in the presence of a patrol car can contribute to reasonable suspicion, even though drivers often slow when they see law enforcement personnel"). Finally, Tippit testified that he was concerned about

9

the truck driver possibly being armed because, during his brief stop, he exited from the vehicle but kept his right arm hidden inside the cab. Medina's overall behavior was therefore consistent with a finding of reasonable suspicion.

The appearance of the pick-up truck before it was stopped, the sixth Brignoni-Ponce factor, also contributed to the Border Patrol agents' reasonable suspicion. Tippit testified that in all his years working in the area, he had never seen a rancher drive around in a pick-up truck with sacks of cattle feed neatly stacked to cover the entire bed truck. See United States v. Nichols, 142 F.3d 857, 871 (5th Cir. 1998) ("This Court has in the past given weight to an agent's observation that a vehicle's appearance was atypical of vehicles in the particular area in question."). Before the vehicle stopped, Tippit also personally observed from his helicopter that the cattle feed had been positioned to hide a black mat, and that two brown cellophane-wrapped packages were stuck in the truck's rear fender well.[2] He then informed the Border Patrol, including Scholz, that the vehicle was "loaded." The pick-up truck's atypical appearance and suspicious cargo thus weigh in favor of reasonable suspicion.

With respect to the seventh factor, information about recent illegal trafficking in the area, the district court's finding that "FM 2810 is . . . a notorious alien and drug smuggling route because it circumvents a Border Patrol Checkpoint located on Highway 67" is well established by the evidence. In

_____

[2] Medina argues that Tippit's personal observations are irrelevant, because "the stop, according to the District Court's findings, was that Agent Scholz and another Border Patrol agent made the stop [sic]," and Scholz himself did not notice anything suspicious about the appearance of the vehicle. Contrary to Medina's assertions, the district court's written order in no way implied that Scholz conducted the stop. As noted above, the district court took note of Tippit and Rendon's conflicting testimony as to whether the stop was consensual or occurred at the request of Tippit, and concluded that Rendon's testimony was not credible. Scholz testified that the vehicle was already stopped when he arrived at the scene—and there is no testimony or other evidence in the record to show otherwise. Even if Scholz had himself conducted the stop, both agents testified that Tippit's observations regarding the truck being "loaded" and Medina's suspicious behavior had been radioed to Scholz before the stop.

addition, Scholz testified that, on the day of the arrest, two suspected "lookout" cars had come through the nearest checkpoint—the same vehicles that were stopped five days earlier, shortly before an unidentified vehicle went through the ranch road on which the Appellants were stopped. There is sufficient evidence of suspicious or illegal activities in the area where the Appellants were stopped to contribute to the agents' reasonable suspicion.

The records contains no evidence that the eighth element of the Brignoni-Ponce test—the "number, appearance, and behavior of the passengers"—provided any support for the agents' reasonable suspicion. However, "under a totality of the circumstances analysis, the absence of a particular factor will not control a court's conclusions." Nichols, 142 F.3d at 866. When viewed in the aggregate, and looking at the evidence in the light most favorable to the government, the first seven Brignoni-Ponce factors amount to a reasonable suspicion that the vehicle's occupants were engaged in illegal activity. While Rendon may be correct that the vehicle could have been traveling on the same road under the same circumstances "for any number of legitimate legal reasons," the reasonable suspicion standard clearly does not require an agent to "eliminate all reasonable possibility of innocent travel before conducting an investigatory stop." Zapata-Ibarra, 212 F.3d at 884; see also United States v. Arvizu, 534 U.S. 266, 277 (2002) ("A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct."). Accordingly, we agree with the district court that the totality of the circumstances created a sufficient level of reasonable suspicion to conduct a stop.

B. Probable Cause to Search the Vehicle

Under the automobile exception to the warrant requirement, a "lesser expectation of privacy" attaches to a vehicle "[w]hen [it] is being used on the highways, or if it is readily capable of such use and is found stationary in a place

11

not regularly used for residential purposes." California v. Carney, 471 U.S. 386, 392 (1985). Therefore, agents may conduct a warrantless search of a readily mobile vehicle "if they have probable cause to believe that the vehicle contains contraband or evidence of a crime." Mack v. City of Abilene, 461 F.3d 547, 552 (5th Cir. 2006). "Probable cause exists when the totality of facts and circumstances within [an agent's] knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." United States v. Nunez-Sanchez, 478 F.3d 663, 666 (5th Cir. 2007) (internal quotation omitted). The agent's knowledge need only "establish that there was a fair probability that a crime occurred." Id. at 666–67 (internal quotation omitted).

Tippit had noticed while flying his helicopter that wrapped and taped packages were stuck in the rear fender well of the pick-up truck. In addition, after the vehicle was lawfully stopped, Tippit and Scholz both observed brown, cellophane wrapped bundles in the back of the cab through the open door of the vehicle. When viewed in light of the totality of the circumstances surrounding the stop, the plain view presence of these bundles—which appeared to be bundles of marijuana—provided probable cause to search the truck. See United States v. Rogers, 719 F.2d 767, 771 (5th Cir. 1983) ("Once the vehicle was stopped, the officer observed black plastic bags containing marihuana in the back seat. Seeing these packages of marihuana in plain view, he had probable cause to seize the contraband."). Accordingly, we agree with the district court that the agents had probable cause to search and seize the vehicle occupied by the Appellants.

## V. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.