# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
September 9, 2021

Lyle W. Cayce
Clerk

No. 17-30524

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

DELWIN MCCLAREN; DEDRICK KEELEN; JAWAN FORTIA;
BRYAN SCOTT; LIONEL ALLEN,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:14-CR-131-9

Before STEWART, HIGGINSON, and WILSON, *Circuit Judges*.

CARL E. STEWART, *Circuit Judge*:

IT IS ORDERED that the government's petition for panel rehearing is GRANTED and that our prior panel opinion, *United States v. McClaren*, 998 F.3d 203 (5th Cir. 2021), is WITHDRAWN and the following opinion is SUBSTITUTED therefor. Appellants' petitions for panel rehearing and for rehearing en banc are DENIED.

Defendants Delwin McClaren, Dedrick Keelen, Jawan Fortia, Bryan Scott, and Lionel Allen were convicted of numerous crimes related to their

No. 17-30524

participation in a New Orleans street gang. We AFFIRM their convictions in part and VACATE in part.

## I. FACTS AND PROCEDURAL HISTORY

Defendants were members of the Young Melph Mafia ("YMM"), a street gang in New Orleans. A grand jury charged Defendants in a second superseding indictment for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Federal Controlled Substances Act, the Federal Gun Control Act, and the Violent Crimes in Aid of Racketeering Act ("VICAR"). The indictment charged Allen, Fortia, and Keelen with numerous substantive VICAR and firearms offenses stemming from several shootings. The indictment additionally charged Defendants with RICO, drug-trafficking, and firearms conspiracies. Fortia and Keelen were charged in all conspiracies, while Allen was charged in the RICO and firearms conspiracies. McClaren and Scott were charged only in the drug and firearms conspiracies.

The district court denied McClaren's and Scott's motions for severance. During jury selection, the district court granted *Batson* challenges by both sides. The six-day trial included almost 70 witnesses and approximately 300 exhibits. At the close of the evidence, the district court denied Defendants' motions for judgments of acquittal. Allen and Fortia were both acquitted of causing death with a firearm, but the jury found Defendants guilty as charged on all other counts. Defendants filed a joint motion for a new trial, arguing the government's witnesses were not credible. The district court denied the motion.

After Defendants appealed, the government informed them that a government witness may have perpetrated an additional shooting with Allen. This court remanded, and Fortia, Keelen, and McClaren filed motions for a new trial. The district court denied the motions, finding the disclosure was

not material. Defendants appealed that denial and their convictions in general.

## II. Discussion

Defendants raise multiple arguments for reversing their convictions. We review each in turn.

### A. Motion to Sever

The district court declined to sever McClaren and Scott's trials. The district court noted that, although McClaren and Scott were not charged with the RICO conspiracy, "there is little doubt as to the interrelatedness of the counts[.]" The district court stated

> [T]he distribution and gun conspiracies here are part of the same scheme of illegal activity as the RICO conspiracy. Not only are multiple defendants common to all three conspiracies, the aims of the RICO and distribution conspiracies are the same—dealing crack cocaine and marijuana in Central City. Moreover, all but one defendant is charged in the gun conspiracy of Count 3, which involves the use of firearms and violence in furtherance of the crimes alleged in Counts 1 and 2. Clearly, these three conspiracies are interrelated.

The court did however issue a limiting instruction, admonishing the jury to consider the case of each defendant separately. McClaren and Scott argue that the court erred in denying their motions to sever, noting that they were charged with significantly less serious crimes than their co-defendants. Neither of them was charged with crimes of violence. They maintain that denying the motion to sever resulted in substantial prejudice because of the highly inflammatory evidence presented against the other defendants.

"We review a denial of a motion to sever a trial under the exceedingly deferential abuse of discretion standard." *United States v. Chapman*, 851 F.3d 363, 379 (5th Cir. 2017) (citation and internal quotation marks omitted). Federal Rule of Criminal Procedure 14(a) provides that a court "may . . .

sever Defendants' trials" if the joinder "appears to prejudice a defendant or the government." FED. R. CRIM. P. 14(a). Nevertheless, "Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Chapman*, 851 F.3d at 379 (citation omitted). Limiting instructions are "generally sufficient to prevent the threat of prejudice[.]" *Id.* (citation and internal quotation marks omitted).

To demonstrate abuse of discretion, Defendants must prove that the joint trial prejudiced them beyond district court protection and that the prejudice outweighed any interest in the economy of judicial administration. *See United States v. Rodriguez*, 831 F.3d 663, 669 (5th Cir. 2016). Defendants must isolate events at trial, demonstrate the events caused substantial prejudice, and show the jury instructions were inadequate to protect them. *See id.*

McClaren and Scott have not met the heavy burden necessary to show that the district court abused its discretion. The district court was correct in noting the interrelatedness of McClaren's and Scott's actions with the rest of the conspiracy, even if McClaren's and Scott's actions were less severe. McClaren and Scott have not pointed to evidence demonstrating that the joint trial prejudiced them beyond protection of the limiting instruction or that prejudice outweighed the interest in economical judicial administration, as they are required to do. *See id.* Furthermore, they have not pointed to the record to show what events created substantial prejudice. *See id.* The cases they cite are all significantly distinguishable from the facts present here.

For example, in *United States v. Cortinas*, this court held that the defendants were entitled to a severance of their trial from seven others tried for offenses involved in a drug conspiracy. 142 F.3d 242, 248 (5th Cir. 1998). Although they had been part of the conspiracy initially, the record showed clearly that the defendants withdrew from the conspiracy before a new gang

joined the conspiracy and violent acts occurred. *Id.* There is no such withdrawal here, and McClaren and Scott were not wrongfully associated with people they had no relation to. *McRae* is similarly distinguishable, featuring a former police officer who shot and killed a victim but was tried jointly with other officers who burned the victim's body to cover up the crime. *United States v. McRae*, 702 F.3d 806, 811–19, 824, 828 (5th Cir. 2012). The trial for the officer would have only lasted three days, but the joint trial lasted a month and focused largely on highly inflammatory evidence that was irrelevant to the murder. Here, the actions of McClaren and Fortia are not so easily separable from the overall conspiracy at issue in this case. While McClaren and Fortia correctly point out that their involvement was significantly less than the other defendants, the court did not abuse its discretion in denying the motion to sever.

## *B. Batson Challenges*

Defendants used all eleven peremptory strikes against white jurors. The government challenged the strikes, and the district court seated three challenged jurors, two of whom served. Defendants argue that the court erred by not asking the prosecution to respond to the proffered race-neutral reasons for striking the jurors. Defendants maintain that their reasons for using peremptory strikes, such as a juror's past military service, were acceptable and non-pretextual. *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 143 n.16 (1994).

Prosecutors are allowed to challenge the defense's peremptory strikes as racially discriminatory. *Georgia v. McCollum*, 505 U.S. 42 (1992). Whether under *McCollum* or *Batson*, the three-step analysis is the same: (1) "the [party challenging the strike] must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose;" (2) once a prima facie case is made, the burden shifts to the striking party to offer a permissible race-neutral justification for the strike;

(3) "if a race-neutral explanation is tendered," the trial court then decides "whether the opponent of the strike has proved purposeful racial discrimination." *Johnson v. California*, 545 U.S. 162, 168 (2005) (internal quotation marks and citations omitted).

"The district court's determination that a party has used peremptory strikes in a discriminatory manner is a finding of fact and thus cannot be overturned by this court absent clear error." *United States v. Bennett*, 664 F.3d 997, 1008 (5th Cir. 2011) (quotation omitted), *vacated on other grounds*, 567 U.S. 950 (2012). A finding is clearly erroneous if "[this court is] left with a definite and firm conviction that a mistake has been committed." *Id.* We give great deference to the district court because *Batson* findings largely turn on evaluating the credibility or demeanor of the attorney exercising the challenge. *Id.*

Because the district court ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the government made a prima facie case is moot. *See United States v. Petras*, 879 F.3d 155, 161 (5th Cir. 2018).

Defendants have not established that the district court committed clear error, a very high burden. District courts are given latitude to simply disbelieve that a proffered, race-neutral reason given is the true reason. *Bennett*, 664 F.3d 997 at 1010. The court considered the race-neutral reasons offered, and concluded that they were pretextual because all eleven strikes were used against the same demographic and because many of the reasons given appeared to be "frivolous." We cannot say that the district court clearly erred in its determination.

## C. Co-Conspirator Testimony

Defendants challenge all their convictions on the basis that they were largely supported by co-conspirator testimony. Defendants point out that

many key witnesses were testifying in exchange for a lighter sentence, and some of their testimony was inconsistent with that of other witnesses.

"[A] defendant may be convicted on the uncorroborated testimony of a coconspirator who has accepted a plea bargain unless the coconspirator's testimony is incredible." *United States v. Valdez*, 453 F.3d 252, 257 (5th Cir. 2006) (alteration in original) (quoting *United States v. Villegas–Rodriguez*, 171 F.3d 224, 228 (5th Cir. 1999)). "Testimony is incredible as a matter of law only if it relates to facts that the witness could not possibly have observed or to events which could not have occurred under the laws of nature." *Id.* (quoting *United States v. Bermea*, 30 F.3d 1539, 1552 (5th Cir. 1994); *see also United States v. Arledge*, 553 F.3d 881, 888 (5th Cir. 2008) (Testimony can also be "incredible" if it is "unbelievable on its face" (quoting *United States v. Carrasco*, 830 F.2d 41, 44 (5th Cir.1987)))). Defendants have not pointed to testimony that meets this high burden of being incredible as a matter of law.

A case where a conviction is based only on the testimony of an accomplice may require a court to issue a limiting instruction. *Tillery v. U.S.*, 411 F.2d 644, 644 (5th Cir. 1969) (finding reversible error where there was no limiting instruction in a case where the accomplice "indicated less concern with the truth than with his own skin"). However, here the lower court did give the jury a limiting instruction regarding the reliability of accomplice testimony.

Therefore, we will consider the testimony of co-conspirators when we review convictions for sufficiency of the evidence.

### D. RICO Convictions

Allen, Fortia, and Keelen challenge their convictions for RICO conspiracy under 18 U.S.C. § 1962(d). They argue that the prosecution failed to prove the existence of a RICO conspiracy. We disagree.

"In reviewing sufficiency of the evidence we view the evidence and all inferences to be drawn from it in the light most favorable to the verdict to determine if a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Delgado*, 401 F.3d 290, 296 (5th Cir. 2005) (quoting *United States v. Posada–Rios*, 158 F.3d 832, 855 (5th Cir. 1998)). When defendants make timely motions for acquittal, as was done here, review is de novo but still "highly deferential to the verdict." *United States v. Bowen*, 818 F.3d 179, 186 (5th Cir. 2016) (quoting *United States v. Beacham*, 774 F.3d 267, 272 (5th Cir. 2014)). "All reasonable inferences are made in favor of the jury's verdict." *Id.* This court must affirm unless no rational jury could have found the offenses' essential elements proven beyond a reasonable doubt. *Id.*

To prove a RICO conspiracy, the government must prove only that defendants conspired to violate 18 U.S.C. § 1962(c). *See United States v. Nieto*, 721 F.3d 357, 368 (5th Cir. 2013). Section 1962(c) states that "[i]t shall be unlawful for any person . . . associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." A "pattern of racketeering activity" is at least two acts of racketeering activity within ten years of each other. 18 U.S.C. § 1961(5). "Racketeering activity" includes state felony offenses involving murder, robbery, extortion, and several other serious offenses and serious federal offenses including extortion and narcotics violations. 18 U.S.C. § 1961(1).

Defendants argue that the government did not prove that YMM was an enterprise. An "enterprise" can be any group of individuals associated in fact although not a legal entity, 18 U.S.C. § 1961(4), and can be inferred from "largely or wholly circumstantial evidence." *United States v. Elliott*, 571 F.2d 880, 898 (5th Cir. 1978). RICO "does not specifically define the outer

boundaries of the 'enterprise' concept," but "[t]he term 'any' ensures that the definition has a wide reach, and the very concept of an association in fact is expansive." *Boyle v. United States*, 556 U.S. 938, 944 (2009) (citations omitted). "An association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946. Finding an enterprise does not require proving a hierarchy, chain of command, role differentiation, membership dues, initiation rituals, or unique modus operandi. *See id.* at 946–48.

The Fifth Circuit in *United States v. Jones* recognized a gang as a RICO enterprise on substantially similar facts:

> ROD had a clear purpose—selling drugs and protecting those drug sales and the group's members—and its members were associated with one another. Members used a house on Mandeville Street to store guns and drugs and to prepare and package the drugs for resale, working in shifts. The owner of the house testified that on at least one occasion, members pooled their money to buy crack for resale. A former member testified that members sold drugs at specific locations, that only members could sell drugs in certain territories, and that members stashed guns for other members' use. Members committed a large number of violent crimes alongside other members.

873 F.3d 482, 490 (5th Cir. 2017). Defendants argue YMM was a friend group without any purpose, and that alleged criminal acts were done independently of each other. However, the government offered sufficient evidence for the jury to conclude that there was a purpose of drug dealing. Several people testified that YMM had a purpose to sell drugs.[1] The

---

[1] For example, a witness testified YMM was "a violent street gang that sold drugs, carried guns, and committed numerous murders" and claimed to be associated with them. Another witness testified that the YMM eventually started selling drugs and toting guns, and then some members became involved in violence.

government offered evidence that members identified themselves with hand signs, YMM tattoos, and clothing. In photos presented to the jury, individuals are holding large amounts of money and guns. There is testimony that this money was from selling drugs. Multiple people testified that YMM members violently retaliated against rivals.[2] There was also testimony that YMM members kept guns for the express purpose of protecting themselves during drug deals. A witness testified that there was a common supplier of drugs to YMM members. Another witness testified some YMM members, including McClaren, pooled money to buy a bigger quantity. He testified they had a specific area they sold in, and other people they did not know could not sell there. This evidence suffices to prove the existence of an enterprise.

Defendants also argue that any enterprise that did exist did not engage in or affect interstate commerce. To prove a violation of RICO, the government must prove beyond a reasonable doubt the existence of an enterprise that affects interstate commerce. *See United States v. Delgado*, 401 F.3d 290, 297 (5th Cir. 2005), *see also* 18 U.S.C. § 1962(c)–(d) (requiring a violator of RICO to be employed by or associated with an enterprise that is engaged in or whose activities affect interstate or foreign commerce). "The nexus with interstate commerce required by RICO is minimal." *Delgado*, 401 F.3d at 297 (internal quotation marks omitted).

---

[2] For example, a witness testified that Vennie Smith was killed because Fortia thought "Vennie was crossing him with the 10th Ward." Another witness testified to an incident where Davis, a member of the 110'ers, which he characterized as a gang, pulled a gun on a YMM member and YMM members went to kill him but it was broken up. The witness testified that the next day Davis was shot by Fortia. A YMM member testifying to a shooting, stated "like we just felt, like, it was just the time—around that time, like, everybody just was, like, testing us. We was, like, if you just mess with us wrong, you was getting it."

The government provided evidence that YMM engaged in daily drug trafficking over a period of several years. Drug-trafficking is a type of economic activity that has been recognized to substantially affect interstate commerce in the aggregate. *See Taylor v. United States*, 136 S. Ct. 2074, 2080 (2016) ("The production, possession, and distribution of controlled substances constitute a class of activities that in the aggregate substantially affect interstate commerce[.]") (citation and internal quotation marks omitted). Considering the government's demonstration of very extensive and long-term engagement in drug trafficking, a rational jury could have concluded beyond a reasonable doubt that YMM's activities had at least a minimal impact on interstate commerce.

Defendants also argue that the government failed to prove each Defendant's individual participation in the RICO conspiracy. Conspiracies must feature an agreement, although the agreement can be informal and unspoken. *United States v. Sanders*, 952 F.3d 263, 274 (5th Cir. 2020). The agreement can be proven by circumstantial evidence alone, but cannot be "lightly inferred." *Id.* at 273–74. "Once the government presents evidence of a conspiracy, it only needs to produce slight evidence to connect an individual to the conspiracy." *United States v. Virgen-Moreno*, 265 F.3d 276, 285 (5th Cir. 2001). A defendant can be convicted of conspiracy even if "he only participated at one level . . . and only played a minor role." *United States v. Posada-Rios*, 158 F.3d 832, 858 (5th Cir. 1998).

The government offered testimony demonstrating that Allen, Fortia, and Keelen were YMM members. The government has offered evidence that all three engaged in at least two instances of racketeering activity in concert with other YMM members or to benefit YMM. First, there is testimony

stating that all three were engaged in drug-trafficking.[3] Additionally, there was evidence that all were involved in violent crime on behalf of YMM, as will be discussed in greater depth in the following section concerning Defendants' VICAR convictions.

The government provided evidence that Allen was involved in several shootings. There is sufficient evidence demonstrating concerted activity between Allen and others to commit a pattern of racketeering activity. For example, a witness testified that Allen drove a car during a shooting at members of a rival group in retaliation for acts committed by that group's members. A member testified that Allen called him to organize a shooting of their rivals, which was then jointly executed. This suffices to show that Allen engaged in a RICO conspiracy.

The burden is similarly met for Fortia. For example, there is testimony that he perpetrated two shootings on YMM's behalf: wounding 110'er Ronnie Davis after Davis quarreled with YMM members, and killing Vennie Smith, suspected of affiliating with the 110'ers. Finally, the government has met its burden for Keelen. A witness testified that Keelen said he had committed two murders. Another member testified that Keelen accompanied YMM members for a shooting.

The government therefore sufficiently proved Allen, Fortia, and Keelen's involvement in a RICO conspiracy. We affirm their convictions under 18 U.S.C. § 1962(d).

---

[3] Four witnesses all testified that Allen sold drugs every day or almost every day. A witness testified that he "could count on one hand how many times" he saw Fortia sell crack. A witness testified that Keelen sold drugs every day. Two witnesses testified that they witnessed Keelen sell drugs a few times. Another witness testified that he saw Keelen sell drugs one time.

No. 17-30524

## E. VICAR Convictions

Fortia, Keelen, and Allen challenge their VICAR convictions under 18 U.S.C. § 1959(a)(3) (assault with a dangerous weapon in aid of racketeering) and § 1959(a)(1) (murder in aid of racketeering).

VICAR states that "[w]hoever . . . for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity . . . murders . . . [or] assaults with a dangerous weapon . . . any individual in violation of the laws of any State or the United States . . . shall be punished[.]" 18 U.S.C. § 1959(a), *see also United States v. Hinojosa*, 463 F. App'x 432, 449 (5th Cir. 2012). The government must prove the following four elements:

> (1) that a criminal organization exists; (2) that this organization is a racketeering enterprise; (3) that the defendant committed a violent crime; and (4) that the defendant acted for the purpose of promoting his position in a racketeering enterprise.

*Hinojosa*, 463 F.App'x at 449 (quotation marks and brackets omitted).

First, Defendants argue that the government failed to prove the existence of an enterprise that affected interstate commerce, as is required to prove a violation of VICAR. 18 U.S.C. § 1959(b)(2). "Courts treat [the definition of enterprise under VICAR] as identical to RICO." *Hinojosa*, 463 F. App'x at 449 n.9. Accordingly, our analysis from the previous section is equally applicable here. Just as the government sufficiently proved the existence of an enterprise affecting interstate commerce for RICO purposes, the government met its burden of proof for VICAR purposes. Similarly, the evidence presented by the government that YMM was engaged in drug trafficking and gang violence suffices to show that the enterprise was involved in racketeering.

Defendants argue that the government failed to prove that they committed the violent crimes in question and that the crimes had the purpose

of promoting their positions in the enterprise. We review for sufficiency of the evidence.

The government provided adequate proof that Defendants committed the violent offenses under VICAR. For each count, the government also provided testimony from which a reasonable jury could surmise that the crime was related to Defendants' positions in YMM as an enterprise.

### 1. Counts 4-5: Shooting of Reginald Turner by Allen

On October 18, 2011, Reginald Turner was shot by individuals in a van. Turner's mother told police she heard approximately 20 shots before Turner ran inside bleeding. Turner was with four others when shot. A YMM member testified that he was aware of a shooting in October 2011 and other members told him that they shot at the 110'ers in the 10th Ward and that Allen drove. The 110'ers were a rival gang of YMM. Another member testified he knew of a shooting on October 18, 2011 involving a van and the 110'ers in the 10th Ward using an FN brand firearm. The pistol casings recovered from that shooting matched an FN that Allen used during a subsequent shooting.

### 2. Counts 6-7: Shooting of Jevarion Jones by Allen

A witness testified that Allen told him that he had shot Jones with an FN handgun while he rode a bike. Jones testified he sold drugs in the same area out of which YMM operated. A YMM member testified that there was a dispute with Jones because Jones tried to kill Allen.

### 3. Count 8: Murder of Vennie Smith by Allen and Fortia

On the day Smith was shot, a witness stated he was with Allen when Allen got a call and then drove off with Fortia and Keelen. Forty-five minutes later, the same witness was at a block party when Allen and Fortia returned, and he heard Fortia say, "I think I shot him in his chest." That day, he saw Allen stash a .45 caliber pistol in a vacant house. Five .45 caliber casings were

No. 17-30524

found at the crime scene. Another witness testified that Fortia told her he killed Smith because he thought Smith "was crossing him with the 10th Ward." A different witness testified that Keelen identified a firearm in the YMM stash as the one Allen and Fortia used to kill Smith.

### 4. Counts 10, 12-13: Murder of Dashawn Hartford and Shooting of Charles Perry by Allen

Charles Perry testified that he and Hartford were outside a bar when Perry was suddenly shot from behind in the legs and Hartford was fatally shot in the back. A witness testified that she was at the bar that night and followed Allen outside. She testified that Allen pushed her to the ground and began shooting Hartford with two pistols. A YMM member testified with regard to the shooting that everyone was "testing" YMM at that time, and so when anyone "mess[ed] with us wrong, you was getting it. If you was saying you was beefing with us, we was coming."

### 5. Count 14: Shooting of Jeffrey Sylvester by Allen

A member of the "Mid-City Killers" ("MCK"), another gang that was allied with YMM, testified that he and Allen used a stolen truck to hunt for Isaac Jones, a Gert Town gang member who had killed several MCK members. The witness said that they spotted Sylvester, a friend of Jones, stop at a red light, and open fire on Sylvester. The witness testified that Allen fired an assault rifle. When Sylvester escaped with a graze wound, they hid the guns in another member's stash spot and dispersed. Another MCK member corroborated this account.

### 6. Counts 15-16: Shooting of Jaquel Variste by Allen

A YMM member testified that Jevarion Jones had tried to kill Allen, so YMM was feuding with Jones. Jones testified that he sold drugs in the same area that YMM operated in. Jones also testified that he was at St. Andrew and Liberty, standing half a block away from Variste when she was

15

shot. Police testified that Variste told them that she was with Jones and other friends when three men exited a car, shot into the crowd, and she was hit while fleeing. A YMM member testified Allen called him that night and said they were going to go "spin," meaning shooting at people. He testified that Allen used an AK-47 to fire at Jones.

*7. Counts 17-18: Shooting of Ronald Thompson and Kentrell McGinnis by Allen*

Thompson testified that he was a member of a gang called the Scar Squad Mafia and sold drugs at the time he was shot. He testified that the gang was also located Uptown, around what is referred to as the 11th Ward. He said he and McGinnis were shot near Washington Avenue and Annunciation Street at the same time. McGinnis testified that he was alone, but that he was shot in the same place at the same time. A YMM member testified that the same night, he came to see Thompson in the hospital and was "talking shit to" Thompson. He said that when, the next day, Allen and an MCK member visited him, he mentioned he saw Thompson in the hospital, and Allen replied, "that's my work." Pistol casings from this shooting matched casings from two other shootings that night involving Allen.

*8. Counts 19-20: Shooting of Terrence Pollard and Brandon Turner by Allen*

Police testified that Pollard told police that he was on a porch on Second Street with friends when four men drove up and opened fire on him, hitting him in the wrist. Pollard testified that he was on his way to his mother's house on Second Street when he was shot in the wrist. A witness testified that he was with Pollard playing cards on a friend's porch around Second Street when about four people in a car pulled up. A witness saw they had guns and ran, he heard shooting, and later found out Pollard had been shot. The witness also testified that he was in a group of friends that sold drugs. Turner testified that he was by himself walking down Second Street

when a car pulled up behind him and someone he didn't see shot him in the leg.

A YMM member testified, "I was outside when [Dwayne and Allen] went to shoot at [Pollard]'s cousin." Ballistic evidence showed that casings from a shooting near Second Street matched the two other shootings that night involving Allen.

*9. Counts 21-25: Murder of Lawrence Burt and Vivian Snyder and Shooting of Joseph Banister by Keelen*

Joseph Banister testified that he was driving Burt and stopped to speak with his aunt, Snyder, in front of her house, when he saw a man with his face covered exit a car, raise an AK-47, and start firing. Snyder was hit in the head, and the shooter ran up and shot Banister and Burt twice each, then shot Banister another four times as he ran. According to Banister, the shooter stopped, stood over Banister, and expressed frustration that Banister was not the right person. Banister also testified that McClaren later told him that the shooter was targeting someone else, "G-Money," whom they believed was in the car. Jones testified around that time he was friends with Ben Watson, who Banister had dropped off earlier that night.

A witness testified that Keelen called to ask for a gun after Jones pulled a gun on Keelen. A YMM member testified that Keelen also told him that Jones pulled a gun on him, and he saw Keelen retrieve an AK-47 before leaving with another MCK member. He testified that after the shooting, Keelen admitted that he went looking for Jones because another member told Keelen to "free" Allen and that "going around there" would make it look like different people did "[w]hatever shooting occurred on St. Andrew." The day after the shooting, Keelen told a witness he was under the influence of pills "last night and I made a mistake and killed Ms. Snyder." Another YMM member testified that after he got out of jail, Keelen told him that he and an MCK member "went around there to take the pressure off" him and

Allen who were "in jail for a shooting around there," and that Keelen mistook Burt for Jones's associate Watson and shot him with a rifle.

*10. Counts 26, 28-29: Murder of Travis Thomas and shooting of Royal Risen*

Risen testified that he and Thomas left the Encore club the night of May 6, 2013, driving onto the interstate where they were shot by unknown assailants. A YMM member testified that in May 2013, he and other YMM members saw Risen and Thomas at the Encore club, who were part of a group they were feuding with, and that another member said he wanted to shoot Risen and Thomas. The member said he, Allen, Keelen, and Scott got in a car together, he fell asleep as Allen was driving, and awoke on the interstate to another member shooting an AK-47 at a car with Thomas and Risen in it. That member testified that he and others in Allen's car followed Risen and Travis onto the interstate, and he and Dorsey fired while Allen drove.

Defendants argue that the government failed to show that these violent offenses had a purpose of maintaining or increasing their position in YMM. "Although the VICAR statute does not criminalize mere retaliation for 'dissing' an individual or a social organization, the statute does criminalize violent acts committed as an integral aspect of membership in a racketeering enterprise." *United States v. Wilson*, 116 F.3d 1066, 1078 (5th Cir. 1997*), rev'd on other grounds sub nom.*, *United States v. Brown*, 161 F.3d 256 (5th Cir. 1998) (en banc). In *Wilson*, the court recognized that "a reasonable jury could find that violent retaliation for acts of disrespect promoted the goals of illegal enterprise" where gang members "carried weapons for the express purpose of protecting themselves and their drugs from other gangs" and aimed to protect their turf. *Id.* Similar facts are present here. The government provided testimony for each of the above violent offenses sufficient for a reasonable jury to conclude that Defendants

committed the crimes as an integral part of membership in YMM, a gang that trafficked drugs.

For these reasons, we affirm Defendants' VICAR convictions.

## F. Drug-trafficking Conspiracy

Fortia, Keelen, McClaren, and Scott were convicted of engaging in a drug-trafficking conspiracy under 21 U.S.C. § 846. A drug-trafficking conspiracy requires: "(1) the existence of an agreement between two or more persons to violate narcotics laws, (2) knowledge of the conspiracy and intent to join it, and (3) voluntary participation in the conspiracy." *United States v. Nieto*, 721 F.3d 357, 367 (5th Cir. 2013) (citation and quotation marks omitted). A conspiracy can be proven by circumstantial evidence. *United States v. Sanders*, 952 F.3d 263, 273 (5th Cir. 2020) ("A jury can infer from the surrounding circumstances whether a defendant participated in and knew of the conspiracy."). "Once the government presents evidence of a conspiracy, it only needs to produce slight evidence to connect an individual to the conspiracy." *Virgen-Moreno*, 265 F.3d at 285.

Defendants argue that the prosecution failed to prove the elements of a conspiracy. We review for sufficiency of the evidence.

There is testimony establishing that all four defendants sold drugs.[4] Defendants argue that any drug dealing was not part of a conspiracy, but individual actions undertaken by individual Defendants. However, the government presented testimony indicating that YMM members would pool

---

[4] *See infra* n.3 discussing evidence of Fortia and Keelen's participation in drug sales. Several witnesses testified that McClaren sold drugs. A witness testified that Scott sold crack "[e]very other day." Another witness stated he witnessed Scott selling cocaine "maybe once or twice." Someone else testified that Scott sold crack, but "not every day." A witness testified that Fortia sold crack a few times.

money to buy drugs, share customers, stand next to each other to sell drugs, and maintain their specific territory.[5]

The government established for McClaren, Scott, Keelen, and Fortia knowledge of the conspiracy, intent to join it, and voluntary participation. Not only was McClaren implicated in a witness's testimony regarding pooling money to buy drugs and other concerted activity, but he was also identified on a phone call talking to another YMM member about being unable to sell crack. A witness testified that Scott frequently carried firearms, including when he was selling drugs, and that he shared firearms with other YMM members. This testimony could reasonably be used by a jury to establish that he was sharing firearms with other YMM members for the purpose of the drug conspiracy. A witness testified that Keelen sold drugs every day, used the same supplier as McClaren, and that he shared guns with other YMM members. When considering these factors together, a reasonable jury could conclude that Keelen knew of the conspiracy and voluntarily participated in it. The same is true for Fortia, who sold crack and marijuana, carried YMM guns in the area where members sold drugs for "protection," and perpetrated two shootings on YMM's behalf.

McClaren argues that he withdrew from the conspiracy. Withdrawal is an affirmative defense requiring affirmative acts, not mere cessation of activity. *United States v. Heard*, 709 F.3d 413, 427–28 (5th Cir. 2013). McClaren fails to point to evidence that he took "affirmative acts

---

[5] A member testified that drugs were pooled together by McClaren, Carter, and Gracin, who pooled money to buy a bigger quantity. He testified they had a specific area they sold in and other people they did not know could not sell there, and they would "run them from around there" if someone tried to sell there. *Id.* Another member testified that YMM members stood near each other to sell drugs. The first member testified the same thing, and that they would share customers, directing them to each other.

inconsistent with the object of the conspiracy that are communicated in a manner reasonably calculated to reach conspirators." *See id.* at 428 (citation omitted). The jury was therefore not required to find that he had withdrawn. McClaren additionally maintains that the district court erred by failing to inform the jury that the withdrawal instruction was specific to him.[6] An unobjected-to instruction is reviewed for plain error. *See United States v. Fairley*, 880 F.3d 198, 208 (5th Cir. 2018). The district court's withdrawal instruction quoted the pattern instruction verbatim. Fifth Circuit Pattern Jury Instructions (Criminal) § 2.18 (2019). We are unaware of any authority requiring the district court to specify that the withdrawal instruction was specific to McClaren. Regardless, McClaren's evidence was insufficient to demonstrate withdrawal, so any error was harmless.

McClaren finally argues that the district court committed reversible error in admitting a witness's testimony that the term "eight ball" used by McClaren in a recorded jail call meant crack. This unobjected-to admission is reviewed for plain error. *United States v. Espino-Rangel*, 242 F. App'x 219, 220 (5th Cir. 2007) (unpublished). McClaren has failed to demonstrate that the admission of this testimony was plainly erroneous. As the witness had familiarity with McClaren's dealing of crack cocaine, he had a basis to determine that an eight ball referred to crack in that instance and it was therefore "rationally based on [his] perception." *See* Fed. R. Evid. 701. McClaren could have cross-examined the witness on his basis for opining that an eight ball meant crack. Moreover, any potential error was harmless because of the substantial other evidence the government had against McClaren regarding the drug conspiracy. We affirm Keelen's, Scott's, and McClaren's convictions.

---

[6] The jury instruction stated: "A defendant has raised the affirmative defense of withdrawal from the conspiracy."

No. 17-30524

### G. Fortia's Ratification of the Conspiracies

Fortia contends that the prosecution failed to prove he ratified his involvement with the drug and RICO conspiracies after turning eighteen. "[A] defendant may be tried for a conspiracy which temporally overlaps his eighteenth birthday" only if "the government can show that the defendant ratified his involvement in the conspiracy after reaching majority." *United States v. Tolliver*, 61 F.3d 1189, 1200 (5th Cir. 1995), *vacated on other grounds sub nom., Moore v. United States*, 519 U.S. 802 (1996). "A juvenile 'ratifies' his involvement in a conspiracy by continuing to participate in an ongoing conspiracy after his 18th birthday. However, a person who does absolutely nothing to further the conspiracy or to reaffirm membership in it after his 18th birthday cannot be held criminally liable as an adult in federal court." *United States v. Peters*, 283 F.3d 300, 309 (5th Cir. 2002).[7]

We must first determine the proper standard of review. Fortia's counsel moved for judgment of acquittal under Rule 29, which generally preserves de novo review of sufficiency of the evidence. *United States v. Shum*, 496 F.3d 390, 391 (5th Cir. 2007). However, Fortia's counsel did not specifically raise the issue of ratification. The government maintains that Fortia's general objection did not preserve his claim on this issue.

---

[7] Every other circuit that has considered this issue has also required that a defendant ratify their membership in a conspiracy after turning eighteen. *See, e.g.*, *United States v. Thomas*, 114 F.3d 228, 264 (D.C. Cir. 1997); *United States v. Wong*, 40 F.3d 1347, 1365 (2d Cir. 1994); *United States v. Maddox*, 944 F.2d 1223 (6th Cir. 1991). Some other circuits have analogized ratification in the conspiracy context to ratification doctrine in contract law. *See Wong*, 40 F.3d at 1366 ("[J]ust as a minor legally incapable of entering a contract may nonetheless be found to have 'ratified' a contract by taking actions after attaining majority consistent with an intent to be bound by it, . . . so a defendant may ratify his pre-eighteen participation in a conspiracy by continued participation after attaining majority.") (internal citations omitted).

No. 17-30524

In *United States v. Farias*, we treated the question of ratification as another element of sufficiency, noting first that the defendants preserved their sufficiency issues by moving for judgment of acquittal, then analyzing whether evidence supported conspiracy convictions, and then finally considering whether the government proved that their involvement in the conspiracy was ratified. 469 F.3d 393, 397–98 (5th Cir. 2006). *Farias* treated the motion as satisfactory for preserving the ratification issue. *Id.* When a defendant challenged the weight and credibility of the post-eighteenth birthday evidence, we noted that "such attacks are improper on sufficiency review." *Id.* at 398. We also treated the ratification question as a sufficiency question in *United States v. Tolliver*, stating "we must determine whether there is sufficient evidence to show [Appellant's] ratification of the conspiracy after his eighteenth birthday." 61 F.3d 1189, 1200 (5th Cir. 1995). This court has repeatedly considered ratification arguments on appeal but has never elaborated on whether a general Rule 29 motion preserves ratification arguments.[8] We are unaware of any authority in other circuits addressing this specific question.

---

[8] In the past, we have applied plain error review to ratification arguments raised on appeal even when Defendants moved for judgment of acquittal, but in a situation where the newly raised argument was specifically that the court improperly failed to instruct the jury on the ratification issue. *See United States v. Harris*, 740 F.3d 956, 962, 965 (5th Cir. 2014); *see also Tolliver*, 61 F.3d at 1199 (reviewing a jury instruction argument for plain error). Here, Fortia does not argue that the court failed to make a necessary instruction, but simply that the government did not meet its evidentiary burden in proving his involvement in a drug conspiracy. Requiring the jury to find ratification in assessing age-of-majority-spanning conspiracies ensures that a defendant charged as an adult is not punished solely for an act—the agreement to join the conspiracy—that he committed as a minor. But again, in this case no party requested such an instruction or requested such a finding. Because no objection was made to its omission, we would be obliged, as we did in *Harris*, 740 F.3d at 966, to deny plain error relief. However, other courts disagree. *See, e.g., United States v. Machen*, 576 F. Appx. 561, 566–67 (6th Cir. 2014).

The government contends that under 21 U.S.C. § 846, it is not required to prove that the defendant ratified his or her participation in a conspiracy, and argues that showing ratification is a separate prosecutorial obligation arising only when a defendant joined a conspiracy as a minor and turned eighteen during the conspiracy. The government argues that the ratification issue is analogous to an extraterritoriality or improper venue issue, which must be specifically raised. The government directs us to two cases. In *United States v. Vasquez*, this court held that extraterritoriality arguments must be raised before the district court to be preserved, but also noted that a challenge on the basis of extraterritoriality cannot be characterized as a challenge to the sufficiency of evidence. 899 F.3d 363, 371–73 (5th Cir. 2018). Because ratification is an issue of sufficiency of evidence, extraterritoriality challenges are not analogous.

In *United States v. Moody*, we noted that venue challenges must be raised by the time of trial under Federal Rule of Criminal Procedure 12. 664 F. App'x 367, 368 (5th Cir. 2016) (unpublished). In *United States v. Carreon-Palacio*, we observed that "[v]enue is an element of any offense; the prosecution always bears the burden of proving that the trial is in the same district as the crime's commission." 267 F.3d 381, 390 (5th Cir. 2001) (internal quotation marks and citations omitted). While the issue of whether venue has been proven is a jury question, "venue differs in substance from statutory offense elements. . . . [it] only constitutes an 'element' of an offense in the narrow context of what must be proven in order for a conviction to pass constitutional muster." *Id.* at 391. We recognized that "the unique character of venue explains in part our rulings with respect to defendants' waiver thereof." *Id.*

While venue and ratification are alike in that the prosecution carries the burden of proving both, and both are not statutory elements of an offense, we are not persuaded that we should treat them alike for purposes of issue

preservation. Venue, as we have explained, has a "unique character," *see id.,* and Rule 12 states that objections to venue are to be made prior to trial. *See* FED. R. CRIM. P. 12(b)(3) ("The following defenses, objections, and requests must be raised by pretrial motion . . . (i) improper venue[.]"). Rule 12 does not require any such objection for ratification, and ratification, unlike venue, would often be an inappropriate issue to raise before trial as the government's evidence of ratification would not have been presented yet. Moreover, ratification, in cases where alleged conspiracies span a person's eighteenth birthday, is highly relevant to the offense, while venue objections are typically unrelated to the substantive crime a person is charged with. We are therefore similarly unpersuaded that we should treat ratification like venue for purposes of issue preservation.

The government also generally argues that because ratification is not an element of 21 U.S.C. § 846, Fortia needed to specifically raise the argument in his motion for judgment of acquittal. However, "Rule 29 motions need not be specific." 553 F.3d 821, 830 (5th Cir. 2008). The ratification question is not a separate defect in the prosecution but instead is a question inextricably connected to whether the government sufficiently proved that Fortia violated 21 U.S.C. § 846. We follow our precedent that Fortia's general motion for judgment of acquittal preserved the ratification issue along with all other issues of sufficiency of the evidence. We therefore will review this ratification argument de novo.

The government cites two examples of Fortia's post-eighteen conduct, arguing that these instances constitute ratification of the conspiracies. The first instance is Fortia's murder of Vennie Smith, a man from the Melpomene Projects. A witness stated that the reason for the killing was that "Fortia thought that Vennie was crossing him with the 10th Ward[.]" The second instance is Fortia's arrest with two other passengers in a vehicle containing a stolen firearm and a couple of cigars filled with

marijuana that police believed that the passengers had been smoking. Police stated that nobody admitted to owning the firearm. Fortia argues that these instances are unrelated to drug trafficking.

While there is broad agreement among the circuits that a defendant must do *something* to ratify his or her participation in a conspiracy, there remains uncertainty as to what quality or quantum of evidence suffices to prove ratification. For this analysis, we will follow the mandate from *Peters* that the government must prove that Fortia "further[ed] the conspiracy or [] reaffirm[ed] membership in it." *Peters*, 283 F.3d at 309.

Fortia's arrest with a small amount of marijuana and a stolen firearm is insufficient to meet that burden. The marijuana was a small quantity, and police believed it was being used by the passengers of the car. No evidence was presented that this marijuana was being trafficked or that Fortia was at that time knowingly involved in any sale or purchase of drugs. It would also be speculative to conclude that the gun was being used for drug trafficking, and if so, that Fortia would have known of this use.

Next is the subject of Smith's murder. The government contends that this murder relates to drug trafficking because its purpose was to maintain YMM's territory. As described earlier, the government presented evidence that the motive of the killing was related to an inter-gang dispute, and that YMM had a purpose of selling drugs. We agree with the government that Smith's murder was sufficient to demonstrate Fortia's ratification of the drug and RICO conspiracies.

## H. Drug Quantity

Keelen, McClaren, Scott, and Fortia contend that the government failed to prove that they specifically conspired to sell 280 grams or more of crack in violation of 21 U.S.C. § 841(a)(1). Drug quantity requiring a mandatory minimum must be proven beyond a reasonable doubt. *United*

*States v. Gonzalez*, 907 F.3d 869, 875 (5th Cir. 2018). The defendant's responsibility is limited to the amount with which he was directly involved or that was reasonably foreseeable to him. *United States v. Haines*, 803 F.3d 713, 740 (5th Cir. 2015). "The government need not seize the actual amount charged to meet its burden," and "[t]he jury can find a drug quantity by extrapolating from the testimony." *United States v. Walker*, 750 F. App'x 324, 326 (5th Cir. 2018) (unpublished).

Defendants argue that the government has failed to prove that any conspiracy entailed the sale of 280 grams of crack and that this amount was foreseeable to all Defendants. They highlight that the drug quantity calculations were the result of expert testimony explaining that generally crack rocks are about a tenth of a gram, and that there was only one actual crack seizure. Defendants argue that it was inappropriate to tell the jury to take the most common quantity seized by the New Orleans Police Department and multiply that by how often witnesses observed YMM members selling drugs.

In this case, because very little crack was actually seized, the drug quantity determination is reliant on the jury multiplying the average weight of a crack rock (0.1 grams) with the frequency with which members sold crack. We discern no clear error in the jury's conclusion that the conspiracy entailed the sale of at least 280 grams of crack. One member testified that he sold crack at least five times every single day from 2007 to 2011. Even if we assume that he began selling very late in 2007 and stopped very early in 2011, this constitutes at least 5,475 transactions,[9] which could easily by itself be more than 280 grams of crack even if that member was selling unusually small quantities. Another member also testified he sold crack every day from 2007 to 2012. Another witness testified that Scott sold crack "every other day

---

[9] This number was reached by multiplying 365 days by 3 years by 5 transactions.

before school and after school" from 2009 until Scott was jailed, and that McClaren sold crack from 2009 to 2012 "every other day." Another witness testified Keelen sold crack "every day" and that he once saw Keelen purchase drugs from another co-conspirator's supplier. It was permissible for the jury to extrapolate that the entire venture totaled over 280 grams. In *United States v. Preston*, this court allowed a similar sort of extrapolation, where a jury was permitted to infer a drug quantity from testimony by multiplying typical amounts sold by frequency of sales. 659 F. App'x 169, 174 (5th Cir. 2016).

Defendants compare this case to *United States v. Daniels*, 723 F.3d 562 (5th Cir. 2013). There, the government seized 1.535 kilograms of cocaine during twelve controlled buys but charged a 5-kilogram conspiracy, urging that the seizures were "the tip of the iceberg" and telling the jury to "infer that there were many other undocumented purchases throughout the life of the conspiracy." 723 F.3d 562, 571–72 (5th Cir. 2013). However, in that case, the jury was asked to infer the existence of many other undocumented purchases through the life of the conspiracy. *Id.* at 571. Here, there is testimony from multiple members suggesting that there were daily sales of crack occurring for years.

The question therefore is whether this amount was foreseeable to all Defendants. Foreseeability does not automatically follow from conspiracy membership. *United States v. Puig-Infante*, 19 F.3d 929, 942 (5th Cir. 1994). A reasonable jury could have found that Keelen, McClaren, and Scott foresaw a total amount of 280 grams of crack from the testimony establishing that each of them dealt crack daily or every other day. Each defendant was involved in the conspiracy, and testimony indicated that at least some YMM members would pool money to buy drugs, share customers, stand next to each other to sell drugs, and maintain their specific territory. The government provided evidence of regular drug sales by YMM members over

a span of many years, with coordination and communication between YMM members generally. In light of the broad range of relevant evidence presented, a reasonable jury could have found that Keelen, McClaren, and Scott foresaw total sales of at least 280 grams of crack throughout the life of the conspiracy.

However, we conclude that there was insufficient evidence to prove that Fortia foresaw a total amount of 280 grams of crack. Unlike the other Defendants, evidence of Fortia's involvement in trafficking crack is far more limited. The government points us to testimony stating that Fortia sold crack "a few times" and testimony from another witness stating that she witnessed Fortia sell crack, but without specifying amounts or frequency. Indeed, the government acknowledged that Fortia only engaged in "minimal drug dealing." While "we previously have observed that an individual dealing in a sizable amount of controlled substances ordinarily would be presumed to recognize that the drug organization with which he deals extends beyond his universe of involvement," we cannot say that Fortia was either directly involved in, or reasonably could foresee, trafficking in sizable amounts based on the evidence provided. *Cf. United States v. Arellano*, 792 F. App'x 306, 310–11 (5th Cir. 2019) (unpublished) (affirming on plain error review the jury's conclusion that the defendant was responsible for a conspiracy involving five kilograms of cocaine where he was in possession of 4.949 kilograms); *Gonzalez*, 907 F.3d at 875 (noting that the defendant was found in possession of three kilograms of cocaine, a sizeable amount which indicated sufficient evidence for the jury to find that he should have reasonably foreseen he was involved in a conspiracy involving five or more kilograms of cocaine). Unlike the other Defendants, the government does not establish that Fortia saw or knew of drug sales by other YMM members with sufficient regularity that the jury could surmise foreseeability. We are not permitted to simply assume that Fortia was aware of the drug amount scope

of the conspiracy because he participated in the conspiracy. *Puig-Infante*, 19 F.3d at 942.

We therefore affirm Fortia, Keelen, McClaren, and Scott's convictions under 21 U.S.C. § 846. We vacate Fortia's sentence for drug-trafficking conspiracy under 21 U.S.C. § 846 and remand for resentencing.

## I. Firearms Offenses

### 1. Allen, Fortia, and Keelen

Allen, Fortia, and Keelen challenge convictions under 18 U.S.C. § 924(c), 18 U.S.C. § 924(o), and 18 U.S.C. § 924(j). 18 U.S.C. § 924(c) prohibits using a firearm during or in furtherance of any crime of violence or drug-trafficking crime. Under 18 U.S.C. § 924(o), "[a] person who conspires to commit an offense under subsection (c) shall be imprisoned for not more than 20 years, fined under this title, or both." Finally, 18 U.S.C. § 924(j) applies to people who cause death in the course of violation of § 924(c). Defendants argue that their § 924 offenses must be reversed because they are predicated on a RICO conspiracy, which is not a crime of violence under *United States v. Jones*, 935 F.3d 266, 271 (5th Cir. 2019).

Review of this unpreserved claim is for plain error. *Id.* at 270. "Plain error review consists of four prongs: (1) there must be an error; (2) the error must be clear or obvious, rather than subject to reasonable dispute; (3) the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it 'affected the outcome of the district court proceedings'; and (4) the court must decide in its discretion to correct the error because it seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* at 271 (internal quotation marks and citations omitted).

This case is directly analogous to *Jones*. In *Jones*, this court found that RICO conspiracy was not a crime of violence and vacated the § 924(o)

convictions even though there was (a) plain error review and (b) the jury could have convicted on the § 924(o) counts by relying on a drug-trafficking predicate. *Jones*, 935 F.3d at 273–74. The only way the government attempts to distinguish this case from *Jones* is by noting that in this case, the jury specifically found that Defendants violated Louisiana's second-degree murder statute, which is clearly a crime of violence. The government argues that because Defendants received the sentencing enhancement under RICO, which is based on a racketeering activity for which the maximum penalty includes life imprisonment, this case involves "aggravated RICO" unlike *Jones*.

The court applies a categorical approach, requiring "looking only to the statutory definitions—i.e., the elements—of a defendant's offense, and not to the particular facts underlying the convictions." *United States v. Buck*, 847 F.3d 267, 274 (5th Cir. 2017). Therefore, the specific finding by the jury that Defendants committed a crime of violence in this case is irrelevant if that statute itself does not require a crime of violence. The default maximum penalty for a RICO conspiracy is twenty years. 18 U.S.C. § 1963(a). However, an enhanced possibility of life applies if the conspiracy "is based on a racketeering activity for which the maximum penalty includes life imprisonment[.]" *Id.* Even if RICO is severable as the government claims, the "aggravated RICO" statute does not describe a crime of violence. *See* 18 U.S.C. § 924(c)(iii)(a) (defining crime of violence as a felony that "has as an element the use, attempted use, or threatened use of physical force[.]").

The government points to several cases from other circuits that are inapposite because they feature severable statutes where the aggravated form of the crime required proving a crime of violence (specifically, that death resulted). *See United States v. Tsarnaev*, 968 F.3d 24, 104–05 (1st Cir. 2020) (holding that a conspiracy charge including a "death results" element was a crime of violence); *In re Hall*, 979 F.3d 339, 346 (5th Cir. 2020) (holding that

kidnapping resulting in death, requiring different elements of conviction from the general federal crime of kidnapping, is a different offense than generic kidnapping); *United States v. Runyon*, 983 F.3d 716, 725–26 (4th Cir. 2020) (also discussing a "death results" element).

We therefore conclude that this case is virtually indistinguishable from *Jones*. In *Jones*, as in this case, the jury could have relied on a drug-trafficking predicate to convict on § 924 offenses. 935 F.3d at 272. This court, in conducting plain error review, held that there was a "reasonable probability that the jury would not have convicted Appellants of the § 924 offenses if the invalid crime-of-violence predicate was not included on the verdict form." *Id.* at 274. In so holding, the court noted that the RICO conspiracy alleged involved acts of violence going beyond the drug conspiracy, and so "[a] reasonable probability remain[ed] that the jury relied upon RICO conduct separate from the drug conspiracy—such as assaults and murders for the purpose of maintaining the gang's territory or reputation—to convict Appellants of the challenged § 924 offenses." *Id.* at 273. The same is true in this case: we cannot determine whether the jury relied on the RICO or drug-trafficking predicate, and because a RICO conspiracy is not a crime of violence, the basis for conviction may have been improper. The court in *Jones* also noted that defendants in that case faced significant sentences based on their § 924 offenses, *see id.* at 274, which is true here as well. Keelen, for example, faces a life sentence for his § 924(j) conviction. Therefore, we conclude that it was plain error to permit the jury to convict Defendants under § 924 and we reverse Allen's, Fortia's, and Keelen's firearms convictions accordingly.

Keelen was also convicted under 18 U.S.C. § 924(j), which provides that "[a] person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm, shall" be punished with a sentence dependent on whether the killing is murder or manslaughter. This

part of the statute in fact does have a "death results" element, but it requires a violation of subsection (c), which prohibits using a firearm during or in furtherance of any crime of violence or drug-trafficking crime. Because a RICO violation is not a permissible predicate offense for a subsection (c) violation, we also reverse Keelen's conviction under 18 U.S.C. § 924(j).

*2. McClaren and Scott*

McClaren and Scott argue that the government failed to prove that they participated in a conspiracy to possess firearms under 18 U.S.C. § 924(o). We review for sufficiency of the evidence.

The government was required to prove that Defendants agreed to violate 18 U.S.C. § 924(c), knew of the agreement's unlawful purpose, and joined in it willfully with the intent to further that purpose. *United States v. Walker*, 750 F. App'x 324, 328 (5th Cir. 2018) (unpublished). 18 U.S.C. § 924(c) prohibits using or carrying a firearm during and in relation to a drug-trafficking crime, as well as possession of a firearm in furtherance of a drug-trafficking crime.

The government has adequately proved the existence of a conspiracy. A YMM member testified that he and others in YMM became interested in acquiring guns for protection once they began selling drugs. The member estimated that YMM accumulated 50-55 guns between 2009 and 2013. He testified that they shared guns, and if a member used the gun last, they bought the bullets. Another witness testified that guns were stashed in Allen's grandmother's house and in other members' homes. Members would move the guns if police were in the area. Another member testified that he kept

guns nearby when he sold drugs, and would receive guns from other members of the group, including Allen, Scott, McClaren, Fortia, and Keelen.[10]

McClaren and Scott argue that the government failed to prove concerted action and at most proved parallel illegal activity. We disagree. A witness testified that Scott frequently carried firearms, including when he was selling drugs, and that he shared firearms with other YMM members. A witness also testified that McClaren stashed firearms nearby for protection while selling drugs. Finally, testimony from a member stated that Scott and McClaren were among the YMM members who would share guns in furtherance of the drug conspiracy. A rational jury could have determined that this evidence sufficed to prove that Scott and McClaren violated 18 U.S.C. § 924(o). We accordingly affirm McClaren's and Scott's convictions.

### J. Admission of Co-Conspirator's Plea Agreement Document

Defendants argue that they are entitled to a new trial based on the use of Shawn Gracin's plea agreement documents as substantive evidence of guilt. They contend that the district court committed reversible error in admitting Gracin's plea agreement documents. When Gracin testified, he disputed the contents of his factual basis. When the government asked, "[s]o if the factual basis says that the Young Melph Mafia was a gang—," defense counsel objected and argued it was "improper for the prosecutor to provide substantive evidence of guilt against the gentlemen on trial with questions that are supposed to be for impeachment." The district court overruled defense counsel's objection but noted a continuing objection regarding questioning as to the factual basis. The government moved to introduce Gracin's factual basis as substantive evidence under Federal Rule of Evidence

---

[10] Specifically, the prosecution asked if he received guns from "Defendants that we just pointed out earlier in this case." Previously, the witness visually identified Allen, Scott, McClaren, Fortia, and Keelen.

801(d)(1)(A), and Gracin's factual basis was published to the jury. The prosecution then questioned Gracin about most of his factual basis, essentially taking him through it line by line.

Defendants argue that the factual basis should not have been used as substantive evidence. We disagree. The factual basis was properly used as substantive evidence under the Federal Rules of Evidence as a prior inconsistent statement. Rule 801(d)(1)(A) states that a statement is not hearsay if "the declarant testifies and is subject to cross-examination about a prior statement, and the statement . . . (a) is inconsistent with the declarant's testimony and was given under penalty of perjury at a trial, hearing, or other proceeding or in deposition[.]" In *United States v. Cisneros-Gutierrez*, we determined that a "factual resume" was properly admitted as substantive evidence when the witness swore facts were true during the plea hearing and recanted on the witness stand. 517 F.3d 751, 757–59 (5th Cir. 2008). Gracin's factual basis is analogous to the one in *Cisneros*. Gracin disputed the contents of his factual basis at trial, and therefore it was appropriate for the court to allow his factual basis to be used as substantive evidence. *See id.*

Defendants, for the first time on appeal, also raise the argument that admission of the factual basis violated the Confrontation Clause of the Sixth Amendment. Defendants and the government disagree on the proper standard of review, but Defendants' arguments fail under any standard. "The Confrontation Clause provides the accused with the right to be confronted with witnesses against him," U.S. CONST. amend. VI. In *Crawford v. Washington*, the Supreme Court held that this right protects against admission of out-of-court testimonial statements unless the witness is unavailable and there was prior opportunity to cross-examine him. 541 U.S. 36, 59 (2004). However, this right is not infringed when a declarant's out-of-court statements are admitted "as long as the declarant is testifying as a witness and

subject to full and effective cross-examination." *California v. Green*, 399 U.S. 149, 158 (1970). Here, Gracin was subject to cross-examination.

Defendants emphasize that the plea agreement contained statements of unnamed cooperators who were not subject to cross-examination. However, any potential violation of the Sixth Amendment was harmless because this evidence was cumulative. Harmless error in the Confrontation Clause context requires a finding that "there was [no] reasonable possibility that the evidence complained of might have contributed to the conviction." *United States v. Alvarado-Valdez*, 521 F.3d 337, 341 (5th Cir. 2008). The factual basis contained information from three people who purchased crack from Gracin and did not testify, which was cumulative evidence of Gracin's own involvement in the drug conspiracy, which he admitted at trial. The potentially problematic sections of the factual basis were all proven by other testimony, and therefore there is no reasonable probability that the jury would have reached a different conclusion had those sections been redacted. Defendants are not entitled to a new trial because of the admission and use of the plea agreement documents.

### K. Motion for New Trial

After sentencing, the government learned that Dorsey, an MCK member who testified for the government, may have committed another shooting with Allen and Scott about which he did not testify. Fortia and Keelen filed a motion for a new trial, which the district court denied. Fortia and Keelen argue that the district court's denial of their motion was improper. We disagree.

The denial of a motion for new trial is reviewed for abuse of discretion, evaluating questions of law de novo. *United States v. Pratt*, 807 F.3d 641, 645 (5th Cir. 2015). Under Federal Rule of Criminal Procedure 33(a), a district court may "vacate any judgment and grant a new trial if the interest of justice so requires." "Motions for new trials based on newly discovered evidence

are disfavored by the courts and therefore are viewed with great caution." *United States v. Sullivan*, 112 F.3d 180, 182–83 (5th Cir. 1997) (internal quotation marks omitted). To receive a new trial for newly discovered evidence, the defendant must satisfy the following prerequisites: "(1) the evidence was newly discovered and unknown to the defendant at the time of the trial; (2) failure to detect the evidence was not a result of lack of due diligence by the defendant; (3) the evidence is material, not merely cumulative or impeaching; and (4) the evidence will probably produce an acquittal." *United States v. Ardoin,* 19 F.3d 177, 181 (5th Cir. 1994).

Fortia argues that this evidence is material to whether or not Dorsey committed the Smith murder himself. However, Fortia's conviction for killing Smith was supported by two other witnesses' testimony that Fortia claimed to have killed Smith. The disclosure of Dorsey's involvement in another shooting does not undermine their testimony and therefore is unlikely to result in an acquittal.

Keelen notes that Dorsey provided the majority of the testimony against Keelen. Keelen argues that further evidence of Dorsey's untruthfulness would have been highly relevant to his credibility to the jury. Newly discovered evidence is not material if its only evidentiary purpose is to impeach trial testimony. *United States v. Eghobor*, 812 F.3d 352, 363 (5th Cir. 2015). Mere impeachment evidence that only casts doubt on the veracity of a witness's testimony and demonstrates a bias on his part "is insufficient to entitle a defendant to a new trial." *Id.*; *see United States v. Garcia-Esparza*, 388 F. App'x 407, 408 (5th Cir. 2010) (evidence introduced to show a witness "lied extensively on the witness stand . . . is impeaching and not a basis for a new trial"). Dorsey was not an untarnished witness whose credibility later came into question; Dorsey was a gang member who admitted to previously lying to the government and believed testifying would help reduce his sentence.

We therefore disagree with Defendants that the evidence was neither merely impeaching nor cumulative and that it would probably produce an acquittal. *See Ardoin*, 19 F.3d at 181. We accordingly affirm the district court's denial of Defendants' motion for a new trial.

## *L. Sentencing*

Finally, Scott and McClaren challenge their sentences. McClaren argues that his 192-month concurrent sentence for drug-trafficking and firearms conspiracies is unreasonable. This court reviews sentences first for procedural error and then for substantive reasonableness. *United States v. Alvarado*, 691 F.3d 592, 596 (5th Cir. 2012). Here, no procedural errors are alleged. We therefore consider the reasonableness of the sentence under the abuse of discretion standard. *Id.* We presume sentences within the properly calculated guidelines range to be reasonable and "infer that the judge has considered all the factors for a fair sentence set forth in the Guidelines." *Id*. To rebut the presumption of reasonableness, a defendant must show the district court did not account for a factor that should have received significant weight, gave significant weight to an improper factor, or clearly erred in balancing the sentencing factors. *Id.*

McClaren has not shown that the district court abused its discretion. McClaren's offense level 32 and criminal history category IV produced a guideline range for Counts 2 and 3 of 168 to 210 months. McClaren received a concurrent sentence of 192 months. His sentence was within the guidelines and is therefore presumptively reasonable. *Alvarado*, 691 F.3d at 597. McClaren was not given an upward departure and has not pointed to any evidence suggesting that the district court improperly weighed factors. Therefore, under our precedent, McClaren's sentence was not unreasonable.

Scott argues that he is eligible for a sentence reduction under the First Step Act, Pub. L. No. 115-391; 132 Stat. 5194, 5220–21 (2018). Under §

No. 17-30524

401(c) of the First Step Act, § 401 applies to offenses committed prior to enactment "if a sentence for the offense has not been imposed as of such date of enactment." Scott was sentenced on November 16, 2017. The Act was enacted on December 21, 2018. The Fifth Circuit has already rejected Scott's argument that the benefits of this statute apply to cases that are still being appealed given the clear language of § 401(c). *United States v. Staggers*, 961 F.3d 745, 753–54 (5th Cir. 2020) (noting that "[a] sentence is imposed when it is pronounced by the district court and not, as [the defendants] would have it, when the appellate process comes to an end"). Therefore, Scott is not statutorily eligible for a sentence reduction.

## III. CONCLUSION

For the aforementioned reasons, we AFFIRM Defendants' convictions under VICAR and RICO. We VACATE Fortia's sentence for drug-trafficking conspiracy under 21 U.S.C. § 846 and REMAND for resentencing. We AFFIRM Keelen, McClaren, and Scott's drug-trafficking conspiracy convictions under 21 U.S.C. § 846 and AFFIRM their sentences. We VACATE Allen, Fortia, and Keelen's firearms convictions under 18 U.S.C. § 924. We AFFIRM McClaren and Scott's firearm convictions under 18 U.S.C. § 924(o). An appendix is attached explaining the outcome for each specific conviction.

## IV. APPENDIX

| Allen | |
|---|---|
| RICO Conspiracy (18 U.S.C. § 1962(d)) | AFFIRM |
| Conspiracy to possess firearms (18 U.S.C. § 924(o)) | VACATE |
| Assault with a dangerous weapon in aid of racketeering (18 U.S.C. § 1959(a)(3)) | AFFIRM |
| Use and carrying firearm during and in relation to a crime of violence and drug-trafficking crime (18 U.S.C. § 924(c)) | VACATE |

No. 17-30524

| | |
|---|---|
| Use and carrying firearm during and in relation to a crime of violence and drug-trafficking crime (18 U.S.C. § 924(c)) | VACATE |
| Murder in aid of racketeering (18 U.S.C. § 1959(a)(1)) | AFFIRM |
| Fortia | |
| RICO Conspiracy (18 U.S.C. § 1962(d)) | AFFIRM |
| Drug-trafficking conspiracy (21 U.S.C. § 846) | AFFIRM CONVICTION, VACATE SENTENCE & REMAND |
| Conspiracy to possess firearms (18 U.S.C. § 924(o)) | VACATE |
| Murder in aid of racketeering (18 U.S.C. § 1959(a)(1)) | AFFIRM |
| Keelen | |
| RICO Conspiracy (18 U.S.C. § 1962(d)) | AFFIRM |
| Drug-trafficking conspiracy (21 U.S.C. § 846) | AFFIRM |
| Conspiracy to possess firearms (18 U.S.C. § 924(o)) | VACATE |
| Murder in aid of racketeering (18 U.S.C. § 1959(a)(1)) | AFFIRM |
| Causing death through the use of a firearm (18 U.S.C. § 924(j)) | VACATE |
| Assault with a dangerous weapon in aid of racketeering (18 U.S.C. § 1959(a)(3)) | AFFIRM |
| Use and carrying firearm during and in relation to a crime of violence and drug-trafficking crime (18 U.S.C. § 924(c)) | VACATE |
| McClaren | |
| Drug-trafficking conspiracy (21 U.S.C. § 846) | AFFIRM |
| Conspiracy to possess firearms (18 U.S.C. § 924(o)) | AFFIRM |
| Scott | |
| Drug-trafficking conspiracy (21 U.S.C. § 846) | AFFIRM |
| Conspiracy to possess firearms (18 U.S.C. § 924(o)) | AFFIRM |